**Slip Op. 10-105**

UNITED STATES COURT OF INTERNATIONAL TRADE

―――――――――――――――――――――――

| | |
|---|---|
| UNITED STATES, | : |
| *Plaintiff*, | : |
| v. | : |
| | Court No. 06-00043 |
| PRESSMAN-GUTMAN CO., INC. and AMERICAN MOTORISTS INSURANCE COMPANY, | : |
| | : |
| *Defendants*. | : |

―――――――――――――――――――――――

[Defendant Pressman-Gutman's Motion to Dismiss granted; Defendant AMICO's Cross Motion to Dismiss Action/Cross Motion for Collateral Security and Attorney's Fees granted in part and denied in part.]

Dated:  September 16, 2010

Tony West, Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (James A. Curley and Jason M. Kenner); Albert Ted Kundrat, Office of the Assistant Chief Counsel, Bureau of Customs and Border Protection, U.S. Department of Homeland Security, Of Counsel; for Plaintiff.

Neville Peterson LLP (John M. Peterson, Curtis W. Knauss, and Michael T. Cone), for Defendant Pressman-Gutman Co., Inc.

Law Offices of Michael P. O'Connor (Michael P. O'Connor), for Defendant American Motorists Insurance Company.

# OPINION

RIDGWAY, Judge:

The Government commenced this action to collect $120,000 in liquidated damages, plus interest, from Defendant Pressman-Gutman Co., Inc., or, in the alternative, from Pressman-Gutman's surety, Defendant American Motorists Insurance Company.  *See*  Plaintiff's Brief in Support of its

Opposition to Defendants' Motions to Dismiss This Action ("Pl.'s Opposition to Motions to Dismiss") at 1, 4; Complaint ¶¶ 1, 5.  The Government contends that Pressman-Gutman is liable for liquidated damages because, according to the Government, the company breached the terms of its customs bond by failing to redeliver certain imported merchandise to the U.S. Customs Service,[1] notwithstanding the agency's issuance of demands for redelivery.  *See* Pl.'s Opposition to Motions to Dismiss at 1-4.[2]

Now pending before the Court is Pressman-Gutman's Motion to Dismiss this action for failure to state a claim upon which relief can be granted, filed pursuant to Rule 12(b)(5) of the Rules of this Court.  *See* Defendant's Memorandum of Law and Points of Authority in Support of its Motion to Dismiss Pursuant to 12(b)(5) ("Pressman-Gutman Motion to Dismiss") at 1, 27; USCIT R. 12(b)(5).  Pressman-Gutman argues, *inter alia*, that Customs' demands for redelivery were untimely, that there is therefore no breach of the company's customs bond and no basis for any claim for liquidated damages, and, accordingly, that this action must be dismissed.  *See* Pressman-Gutman Motion to Dismiss at 1-3; Defendant's Reply Addressed to its Motion to Dismiss ("Pressman-Gutman Reply") at 1-2.

In its Cross Motion to Dismiss Action/Cross Motion for Collateral Security and Attorney's Fees, AMICO seconds Pressman-Gutman's arguments urging dismissal of this action.  *See*

---

[1]The U.S. Customs Service – formerly part of the U.S. Department of Treasury – is now part of the U.S. Department of Homeland Security, and is commonly known as U.S. Customs and Border Protection.  *See* <u>Bull v. United States</u>, 479 F.3d 1365, 1368 n.1 (Fed. Cir. 2007).  The agency is referred to as "Customs" herein.

[2]The terms "demand for redelivery," "notice to redeliver," "request for redelivery," and "notice of redelivery" are used interchangeably in customs practice.

Defendant, American Motorists Insurance Company's Memorandum of Law and Points of Authority in Support of its Cross Motion to Dismiss and for Collateral Security and Attorney's Fees ("AMICO Cross-Motion") at 1-2.  But AMICO devotes the bulk of its seven-page brief to its claim against Pressman-Gutman for collateral security and attorneys' fees and expenses under an indemnity agreement between the two parties.  *See* AMICO Cross-Motion at 2-7.

Based on its assertions that Customs' demands for redelivery were untimely (and that the claim for liquidated damages is therefore without merit), Pressman-Gutman argues that it should not be required to provide collateral security to AMICO, or, in the alternative, that it should be permitted to deposit the security with the Court.  *See* Defendant's Memorandum of Law and Points of Authority in Support of Its Response to American Motorists Insurance Company's Cross-Motion to Dismiss and for Collateral Security and Attorney's Fees ("Pressman-Gutman Response to Cross-Motion") at 1-2, 9-13.  In addition, Pressman-Gutman contends that conflicts of interest and other grounds mitigate its obligation to reimburse AMICO's attorneys' fees and expenses.  *See* Pressman-Gutman Response to Cross-Motion at 2, 13-20.

Jurisdiction lies under 28 U.S.C. §§ 1582 and 1583 (1994).[3]  For the reasons that follow, Pressman-Gutman's Motion to Dismiss must be granted.  AMICO's Cross-Motion as to collateral security is therefore denied as moot; and, as to attorneys' fees and expenses, the Cross-Motion is granted in part and denied in part.

---

[3]All citations to federal statutes herein are to the 1994 edition of the United States Code. Similarly, all citations to federal regulations are to the 1999 edition of the Code of Federal Regulations.

## I.   The Motions to Dismiss Filed by Pressman-Gutman and AMICO

Pressman-Gutman emphasizes that Customs regulations require that, in a case such as this, "any demand for redelivery . . . be made no later than . . . 30 days after the end of the conditional release period."  *See* 19 C.F.R. § 113.62(d); *see generally* Pressman-Gutman Motion to Dismiss at 6-17; Pressman-Gutman Reply at 1-2.  Pressman-Gutman further argues that Customs Headquarters has consistently interpreted agency regulations to mean that, in a case such as this, the "conditional release period" begins when Customs requests a sample of the merchandise at issue, and ends when Customs receives the requested sample.  *See* Pressman-Gutman Motion to Dismiss at 7-15; Pressman-Gutman Reply at 2-3.

Here, it is undisputed that the demands for redelivery were made well more than 30 days after Customs received the requested samples.  *See* Complaint ¶¶ 13-14, 25-26.  As such, Pressman-Gutman contends that Customs' demands for redelivery were untimely and are unenforceable, that there was therefore no breach of Pressman-Gutman's customs bond, and that there is thus no basis for the liquidated damages claim that is the subject of this case.  *See* Pressman-Gutman Motion to Dismiss at 2, 17; Pressman-Gutman Reply at 1.  Accordingly, Pressman-Gutman reasons, the Government cannot maintain this action.  *See* Pressman-Gutman Motion to Dismiss at 2-3, 27; Pressman-Gutman Reply at 2.

The Government concedes that the demands for redelivery in this case were made well more than 30 days after Customs received the requested samples from Pressman-Gutman.  *See* Pl.'s Opposition to Motions to Dismiss at 3-4.  However, the Government contends that an individual Customs staffer at the Port of JFK Airport in New York "extended" the conditional release periods

here within 30 days of Customs' receipt of the samples, by sending notices to Pressman-Gutman stating that the samples had been forwarded to the lab for analysis and that the "[c]onditional release period [was being] extended for 90 days pending lab analysis." *See id.* at 2-6, 9-13; Complaint, Exhs. 5, 14.  The Government asserts that, because the demands for redelivery were issued within 30 days after the end of the "extended" conditional release period, the demands were therefore timely. *See* Pl.'s Opposition to Motions to Dismiss at 5, 8-10, 14.  The Government concludes that Pressman-Gutman breached the terms of its customs bond by failing to redeliver the merchandise at issue, and that Customs is therefore entitled to the liquidated damages at issue in this action. *See id.* at 1-2; Complaint ¶¶ 6-7, 15, 19, 27, 31.

As detailed below, the Government's theory of this case is bankrupt.  Its argument rests entirely on the slender thread of a single phrase that is read out of context and appears in only a handful of Customs documents, all of which date back nearly two decades.  Even more to the point, the Government's case flouts both (1) 19 C.F.R. § 113.62(d), which requires that Customs make any demand for redelivery within 30 days of the end of the "conditional release period," and (2) approximately 20 years of rulings by Customs Headquarters, which have consistently and repeatedly interpreted the agency's regulations to mean that, in a case such as this, the "conditional release period" ends when Customs receives a requested sample.

The Government has no colorable claim here.  This is an action that never should have been brought; and the motions to dismiss it now must be granted.

A.  <u>Statement of Facts</u>

The relevant facts are straightforward and uncontested.  This action arose from a classification dispute involving two entries of textile fabrics made in September 1999 – the first entry on or about September 3, 1999, and the second on or about September 22, 1999.  *See* Pressman-Gutman Motion to Dismiss at 3-4; Pl.'s Opposition to Motions to Dismiss at 3; Complaint ¶¶ 9-10, 21-22, Exhs. 2-3, 11-12.  Soon after each entry, Customs issued a standard form "Request for Information" ("CF 28") for each of the two entries, requesting samples of the merchandise as part of the agency's analysis of the proper classification and quota category for the goods.  *See* Complaint ¶¶ 11, 23, Exhs. 4, 13; Pressman-Gutman Motion to Dismiss at 4-5; Pl.'s Opposition to Motions to Dismiss at 3-4; Pressman-Gutman Response to Cross-Motion at 3.  The fabric's country of origin was never at issue.  *Id*.

Pressman-Gutman promptly complied with Customs' requests.  The samples from the first and second entries were sent to Customs on or about October 6, 1999 and on or about October 19, 1999, respectively.  *See* Pl.'s Opposition to Motions to Dismiss at 3-4; Complaint ¶¶ 12, 24, Exhs. 4, 13.  The record does not disclose exactly when Customs received the samples.  It is, however, undisputed that Customs received the samples from the first entry no later than October 15, 1999, and from the second entry no later than October 25, 1999, because – on those dates, respectively – a Customs staffer at the Port of JFK Airport issued additional CF 28s, both of which stated (in upper case letters):

> [Samples] sent to the lab for analysis.  Conditional release period extended for 90 days pending lab analysis.  Failure to retain merchandise during the conditional release period can result in liquidated damages.

Complaint ¶¶ 13, 25, Exhs. 5, 14; *see also* Pressman-Gutman Motion to Dismiss at 4-5; Pl.'s Opposition to Motions to Dismiss at 3-4.

One month passed, followed by another, and yet another.  Then, on February 8, 2000, more than three months (and, in the case of the first entry, nearly four months) after the agency had acknowledged receipt of the samples from Pressman-Gutman, Customs demanded redelivery of the merchandise from both entries.  *See* Pressman-Gutman Motion to Dismiss at 4-5; Pl.'s Opposition to Motions to Dismiss at 3-4; Pressman-Gutman Response to Cross-Motion at 3; Complaint ¶¶ 14, 26, Exhs. 6, 15.  According to the demands for redelivery, the fabric had been misclassified upon entry and had entered the United States under the wrong quota category.  *See* Pressman-Gutman Response to Cross-Motion at 3.

The demands for redelivery directed Pressman-Gutman to either return the merchandise to Customs' custody or submit new visas reflecting the proper quota category from the exporting country.  *See* Pressman-Gutman Response to Cross-Motion at 3.  However, because so much time had elapsed between Pressman-Gutman's submission of the requested samples and Customs' demands for redelivery, such visas were no longer available.  *Id.*  The passage of time also made it impossible for Pressman-Gutman to return the merchandise to Customs' custody.  The goods had already been delivered to the company's customers.  *See id.*; Recording of Oral Argument at 00:13:10.

When Pressman-Gutman failed to redeliver the merchandise to Customs, the agency advised the company that liquidated damages had been incurred.  *See* Pl.'s Opposition to Motions to Dismiss

at 4; Complaint ¶¶ 15, 27.   After Pressman-Gutman refused to pay the assessment of liquidated

damages (on the grounds that the demands for redelivery were untimely), Customs demanded

payment from AMICO (Pressman-Gutman's surety), which also refused to pay.   *See* Pl.'s

Opposition to Motions to Dismiss at 4; AMICO Cross-Motion at 3-4; Complaint ¶¶ 16, 19, 28, 31,

Exhs. 8, 17.   The Government then filed this action against Pressman-Gutman and AMICO, seeking

the liquidated damages that are assertedly due.[4]

## B.   Standard of Review

In reviewing a motion to dismiss for failure to state a claim, "any factual allegations in the

complaint are assumed to be true and all inferences are drawn in favor of the plaintiff."   Amoco Oil

Co. v. United States, 234 F.3d 1374, 1376 (Fed. Cir. 2000); *see generally* USCIT Rule 12(b)(5).

Dismissal under Rule 12(b)(5) is thus proper only if the plaintiff's allegations of fact are not

"enough to raise a right to relief above the speculative level . . . on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)."   Bell Atl. Corp. v. Twombly, 550

U.S. 544, 555-56 (2007) (citations omitted).

At the same time, however, a complaint's "[t]hreadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice."   Ashcroft v. Iqbal, 556 U.S.

____, ____, 129 S.Ct. 1937, 1949 (2009) (citation omitted).   Moreover, "only a complaint that states

---

[4]Pressman-Gutman's protest challenging the timeliness of the demands for redelivery of its
merchandise was denied.   *See* Pressman-Gutman Motion to Dismiss at 5 n.1.   Thereafter, Pressman-
Gutman filed suit in this court contesting the denial of that protest.   That case – Pressman-Gutman
Co., Inc. v. United States, Court No. 04-00511 – remains on the court's Reserve Calendar, and will
be mooted by the resolution of this action.   *See id.*; Recording of Oral Argument at 00:08:50.

a plausible claim for relief survives." <u>Iqbal</u>, 556 U.S. at ____, 129 S.Ct. at 1950. And, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" <u>Iqbal</u>, 556 U.S. at ____, 129 S.Ct. at 1949 (*quoting* <u>Twombly</u>, 550 U.S. at 557 (brackets omitted)).

In the instant case, the nuances of <u>Iqbal</u> and <u>Twombly</u> are purely academic. As detailed below, whether considered under <u>Iqbal</u>, <u>Twombly</u>, or any other standard, it is not just implausible that the Government could prevail in this case; it is impossible.

## C.  <u>Analysis</u>

Pointing to a long and unbroken line of Customs Headquarters rulings stretching back roughly two decades, Pressman-Gutman emphasizes that the agency "has repeatedly and consistently held that Customs officials must issue [any] redelivery notice within thirty days of receiving a sample or other information from the importer in response to a Customs Form 28 ['CF 28' or 'Request for Information']." *See* Pressman-Gutman Reply at 2; *see generally id*. at 3 n.4, 7, 9-10; Pressman-Gutman Motion to Dismiss at 2, 6-17.

As Pressman-Gutman notes, the relevant Customs Headquarters rulings "interpret[ ] two governing regulations [concerning the timing of demands for redelivery] so as to resolve ambiguities therein." *See* Pressman-Gutman Reply at 2-4; *see also* Pressman-Gutman Motion to Dismiss at 7, 15-16; HQ 088904 (Feb. 19, 1992) (explaining Customs Headquarters' belief that 19 C.F.R. § 113.62(d) and 19 C.F.R. § 141.113(c) "must be read in conjunction with one another").

The first regulation – 19 C.F.R. § 141.113(c) – requires that Customs issue any demand for

redelivery of imported merchandise "promptly," but does not define that term.  *See* 19 C.F.R. §

141.113(c).  Customs Headquarters rulings explain that the second regulation – 19 C.F.R. §

113.62(d) – gives meaning to the term "promptly."  In relevant part, § 113.62(d) expressly requires

that "any demand for redelivery . . . be made *no later than 30 days after the date that the*

*merchandise was released or 30 days after the end of the conditional release period* (*whichever is*

*later*)."  19 C.F.R. § 113.62(d) (emphasis added).  And, finally, Customs Headquarters rulings state

unequivocally that – in cases such as this – the "conditional release period" referred to in §

113.62(d) *begins* when Customs requests that an importer provide a sample or other information,

and *ends* upon Customs' receipt of the requested sample or other information.  By regulation, any

demand for redelivery must be made no later than 30 days thereafter.  *See* 19 C.F.R. § 113.62(d).

Customs' own series of "Informed Compliance" publications reflects the agency's well-

settled reading of 19 C.F.R. § 113.62(d) and 19 C.F.R. § 141.113(c) as requiring that, in a case such

as this, any demand for redelivery be made no later than 30 days after Customs' receipt of a

requested sample.  Customs publication *What Every Member of the Trade Community Should Know*

*About: Entry* expressly states, flatly and unequivocally:

> *A demand for redelivery will be made on CF 4647 no later than . . . 30 days after the*
> *end of the conditional release period . . . .   A conditional release period is*
> *established in one of two ways*:
>
> 1.  By regulation, *e.g.*, 19 CFR 141.113(b) (180 days to determine country of
>     origin of textiles); or
> 2.  By notifying the importer of record of a conditional release period within 30
>     days after release, such as through issuance of a CF 28 "Request for
>     Information" requesting a sample.  *The issuance of a notice establishes the*
>     *beginning of the conditional release period*; *the period ends when CBP*
>     *receives the sample.*

> A failure to comply with a request for redelivery will result in the issuance of a demand for liquidated damages.

U.S. Customs and Border Protection, *What Every Member of the Trade Community Should Know About: Entry* (March 2004) at 15 (emphases added).  The Government fails even to acknowledge – much less seek to explain away – this "Informed Compliance" publication and its clear and unqualified articulation of Customs Headquarters' "bright line" rule on the timing of the issuance of demands for redelivery, distilling and succinctly restating the holdings of numerous Customs Headquarters rulings over the years.

Pressman-Gutman cites HQ 115941 as a case with facts "astonishingly similar" to the facts of this case.  *See* Pressman-Gutman Motion to Dismiss at 12; HQ 115941 (May 15, 2003); *see generally* Pressman-Gutman Motion to Dismiss at 10-12 (discussing HQ 115941).  In that case, Customs Headquarters cancelled redelivery notices issued by Customs personnel at the Port of JFK Airport.  *See* HQ 115941.

The importer at issue in HQ 115941 had made three entries of garments under a folklore provision of the Harmonized Tariff Schedule of the United States ("HTSUS") that was free from quota and visa requirements.  *See* HQ 115941.  To verify that the merchandise was properly classified and therefore free from quota and visa requirements, Customs timely issued three Requests for Information (CF 28s) to the importer, requesting samples and descriptive literature.  *Id*.  The CF 28 relating to the first entry was dated January 12, 2000, while the CF 28s relating to the other two entries were dated February 11, 2000.  *Id*.  The importer submitted the requested samples, but explained that no descriptive literature was available.  *Id*.  Customs received the sample related to

the first entry on February 2, 2000, and received the samples for the two remaining entries on March

8, 2000.  *Id.*

On February 11, 2000, the port issued yet *another* CF 28 "which was attributed to [the first

entry] in Block 5 [of the form] but noted that '[p]ending on [the other two entries] (descriptive

literature and catalogues) . . . The samples are going to be sent to national import specialist to

determine classification and to determine if the items are traditional folk lore exempt from quota.'"

*See* HQ 115941.  Thereafter, Customs personnel at the port forwarded the samples and literature

(which had been located in the meantime) to the National Commodity Specialist, who concluded that

the garments did not qualify as folklore items.  *Id.*  Customs personnel at the Port of JFK Airport

issued demands for redelivery on April 25, 2000, followed by a demand for liquidated damages on

June 7, 2000.  *Id.*

Thus, as Pressman-Gutman correctly observes, the demand for redelivery as to the first entry

in question in HQ 115941 was issued not 30 days but, rather, nearly three months after Customs

received the requested sample; and the demands for redelivery as to the other entries were issued

nearly two months after the samples were received.  *See* Pressman-Gutman Motion to Dismiss at

11; HQ 115941.  The importer protested the demands for redelivery as untimely, and readily

prevailed.  *See id.*

In HQ 115941, Customs Headquarters explained:

In Customs Service Decision [C.S.D.] 90-99, [Customs] stated that 19 C.F.R. §
113.62(d) prevents it from enforcing a demand for redelivery issued over 30 days
after the date that the merchandise was released unless a conditional release period
is established.  In addition, a request for a sample on a CF 28 made no later than 30
days after release of the merchandise establishes a conditional release period.  *The*

> *beginning of the conditional release period is the date the CF 28 is issued*, *and the
> end of the conditional release period is the date* [*Customs*] *receives the sample.*  A
> demand for redelivery must be made no later than 30 days after the sample is
> received.
>
> For the subject merchandise, conditional release periods were established on January
> 12, 2000, and . . . on February 11, 2000, when [Customs] requested samples.  *The
> conditional release period for the merchandise that is the subject of* [*the first entry*]
> *ended on February 2, 2002, when a sample was supplied.  Similarly, the conditional
> release period for the merchandise pertaining to the other two entries ended on
> March 8, 2000, when* [*Customs*] *received the requested samples.* [*Customs*] *had 30
> days from each of those dates to demand redelivery of the respective merchandise.*
> The CF 4647 redelivery demands were issued on April 25, 2000, *well beyond the 30-
> day allowable period.*  Consequently, the demands for redelivery were not timely and
> are unenforceable.

HQ 115941 (emphases added).

In the case at bar, the record does not indicate precisely when Customs received the samples

submitted by Pressman-Gutman.  However, the Complaint avers that the Customs notices advising

Pressman-Gutman that the samples had been sent to the laboratory are dated October 15, 1999 and

October 25, 1999.  *See* Complaint ¶¶ 13, 25.  And both demands for redelivery were issued on

February 8, 2000.  *See* Complaint ¶¶ 14, 26.  Accordingly, by the Government's own admission, the

demands for redelivery in this case were not issued until well over three months after the samples

were in Customs' possession.  Pressman-Gutman argues that "[u]nder the authority of HQ 115941,

the subject redelivery notices were patently untimely, and the Complaint fails to state a cause of

action."  *See* Pressman-Gutman Motion to Dismiss at 12.

Moreover, as Pressman-Gutman emphasizes, "the holding of HQ 115941 was not a

watershed development."  *See* Pressman-Gutman Motion to Dismiss at 12.  To the contrary, the

strict time limitations set forth and enforced in HQ 115941 can be traced back in time, to C.S.D. 90-

99 and beyond. *See generally* C.S.D. 90-99 (HQ 732043) (June 28, 1990). In C.S.D. 90-99, one of the seminal rulings on point, Customs Headquarters clearly set forth the time limitation on Customs' request for samples or other information as well as the time limitation on Customs' issuance of any demand for redelivery, and – at the same time – explained the duration of the "conditional release period" for purposes of 19 C.F.R. § 113.62(d):

> For purposes of 19 C.F.R. 113.62(d), we consider a request for a sample on a Customs Form (CF) 28 Request for Information, . . . issued by Customs no later than 30 days after the date the merchandise is released, to establish a conditional release period. *The beginning of the conditional release period is the date the CF 28 is issued; the end of the conditional release period is the date Customs receives the sample. . . . [Any] demand for redelivery must be made no later than 30 days after the end of the conditional release period, i.e., 30 days after the receipt of the sample by Customs.*

C.S.D. 90-99 (HQ 732043) (emphasis added).

Further, as Pressman-Gutman explains, Customs Headquarters restated its position in response to industry inquiries about the meaning of C.S.D. 90-99. *See generally* Pressman-Gutman Motion to Dismiss at 13-14 (discussing HQ 223315 (Sept. 4, 1991); HQ 223535 (Sept. 21, 1992)). And, notwithstanding "widespread resistance from its personnel in the field," a long series of Customs Headquarters rulings has consistently and "steadfastly" maintained the position articulated in C.S.D. 90-99 (HQ 732043) – that is, that, in a case such as this, "the agency has only 30 days from receipt of the sample to issue a redelivery notice." *See* Pressman-Gutman Motion to Dismiss at 12.

A little more than a year after C.S.D. 90-99 (HQ 732043) was released, Customs issued HQ 223315 – a letter authored by the Deputy Commissioner of Customs, addressing questions raised

by the Northern Border Customs Brokers Association about the intent of C.S.D. 90-99. *See* HQ

223315 (Sept. 4, 1991). Reiterating Customs Headquarters' position set forth in C.S.D. 90-99 – *i.e.*,

that any demand for redelivery must be made no later than 30 days after Customs' receipt of

requested samples – HQ 223315 explains:

> Thank you for your letter . . . expressing your Association's position regarding
> C.S.D. 90-99. You have stated your concern that, through said decision, the time-
> frame within which the district director may demand redelivery for merchandise has
> been expanded and subjects the importer at some later time to punitive damages.
>
> The period during which a sample may be obtained and redelivery ordered is set
> forth in the regulations. . . . C.S.D. 90-99 does not contract nor expand the time-
> frame provided for in the regulations. This decision does not establish a new time-
> frame for notice of redelivery. Customs still has only 30 days from the date of
> release of merchandise within which to request a sample. *Thereafter*, *Customs has
> an additional 30 days from the date of receipt of the sample within which to demand
> redelivery or take any other appropriate action*.
>
> Nonetheless, we are aware of the fact that there may be some misunderstanding
> regarding the scope of C.S.D. 90-99. Therefore, the Office of Regulations and
> Rulings [at Customs Headquarters] is in the process of reviewing this issue in order
> to clarify any misinterpretation which may exist.

HQ 223315 (emphasis added).

HQ 223315 was followed by HQ 223535, roughly one year later. HQ 223535 – entitled

"Issuance of Guidelines on the Time in which Demand for Redelivery Must be Made" – was

authored by the Director of the Commercial Rulings Division, in the Office of Regulations and

Rulings at Customs Headquarters. *See* HQ 223535 (Sept. 21, 1992). HQ 223535 once again

reinforced the 30-day time limitation on Customs' issuance of demands for redelivery, stating:

> As you are probably aware, a letter, signed by the Deputy Commissioner, was sent
> on September 4, 1991, to the . . . Brokers Association on the subject of the time
> within which Customs may demand redelivery of merchandise. A copy of this letter

([HQ] 223315) is attached.  Basically, the position taken in this letter is that Customs has 30 days from the release of merchandise within which to request information about, or a sample of, the merchandise.  If such a request is made, *Customs has a second 30-day period from the date of receipt of the information or sample within which to demand redelivery or take other appropriate action.*

. . . . . . .

[*A*] *Notice of Redelivery must be* "*promptly*" *issued, that is, it must be issued* either: (1) no later than 30 days after the date the merchandise is released if there is no occurrence establishing a conditional release period; or (2) if there is an occurrence establishing a conditional release period . . . , no later than 30 days after the end of that period (*e.g.*, if information or a sample is requested, *within 30 days from the date of receipt by Customs of the information or sample*) . . . .

HQ 223535 (emphases added).

The District Director of Customs at the Port of Charleston subsequently challenged the time limits set forth by Customs Headquarters in HQ 223315 and HQ 223535, expressing concerns about, *inter alia*, the "danger" inherent in requiring any demand for redelivery to be issued no more than 30 days after Customs' receipt of requested samples.  In HQ 951300, Customs Headquarters acknowledged the legitimacy of the concerns raised, but nevertheless rebuffed the District Director's challenge and reaffirmed the time limitations once more, explaining:

A policy determination was set in September 1991 by the Deputy Commissioner that Customs must examine the goods or request samples in the first 30 days after the release; thereafter, Customs must complete its exam and order redelivery in the next 30 days.  *The danger of limiting the time period to decide admissibility to 30 days from the receipt of the sample was raised*. . . .

After your request [for reconsideration of the time limitations], this matter was again brought to the attention of the Assistant Commissioner . . . .  A meeting with the Assistant Commissioner was held in late January [1993] on the subject.  *However, the Assistant Commissioner upheld the prior position on the time in which demand for redelivery must be made by Customs.*

HQ 951300 (Aug. 3, 1993) (emphases added).

The Customs Headquarters rulings discussed above have never been modified or revoked to date.  Indeed, Customs Headquarters has continued to consistently articulate and apply the time limitations discussed above set forth therein in a wide range of rulings interpreting 19 C.F.R. § 141.113(c) (which requires that any demand for redelivery be issued "promptly") and/or 19 C.F.R. § 113.62(d) (which requires, *inter alia*, that any demand for redelivery be made "no later than 30 days . . . after the end of the conditional release period" – *i.e.*, no later than 30 days after Customs' receipt of requested samples).  *See, e.g.*, HQ 224872 (July 5, 1994); HQ 225319 (July 26, 1994); HQ 226218 (March 19, 1996); HQ114693 (Dec. 10, 1999); HQ 115941 (May 15, 2003); HQ W968383 (March 2, 2007).[5]

---

[5]*See* HQ 225319 (July 26, 1994) (interpreting 19 C.F.R. §§ 113.62(d) and 141.113(c) together to require that any notice of redelivery must be "promptly" issued – *i.e.*, issued within the applicable 30-day period set forth in § 141.113(d), such that "if information or a sample is requested," any notice of redelivery must be issued "within 30 days from the date of receipt by Customs of the information or sample"); HQ 226218 (March 19, 1996) (interpreting §§ 113.62(d) and 141.113(c) together to require that any notice of redelivery must be "promptly" issued – *i.e.*, issued within the applicable 30-day period set forth in § 141.113(d), such that "if information or a sample is requested," any notice of redelivery must be issued "within 30 days from the date of receipt by Customs of the information or sample"); HQ 114693 (Dec. 10, 1999) (voiding a demand for redelivery as untimely and unenforceable, invoking C.S.D. 90-99 (HQ 732043) and explaining that "[t]he beginning of the conditional release period is the date the CF 28 is issued," "the end of the conditional release period is the date Customs receives the sample," and "[any] demand for redelivery must be made no later than 30 days after the sample is received"); HQ 115941 (May 15, 2003) (voiding a demand for redelivery as untimely and unenforceable, invoking C.S.D. 90-99 (HQ 732043) and explaining that "[t]he beginning of the conditional release period is the date the CF 28 is issued," "the end of the conditional release period is the date CBP receives the sample," and "[any] demand for redelivery must be made no later than 30 days after the sample is received"); HQ W968383 (March 2, 2007) (interpreting §§ 113.62(d) and 141.113(c) together to require that any notice of redelivery must be "promptly" issued – *i.e.*, issued within the applicable 30-day period set forth in § 141.113(d), such that "if information or a sample is requested," any notice of redelivery must be issued "within thirty days from the date of receipt by CBP of the information or sample").

### 1. The Government's Arguments

The Government raises several arguments in an effort to establish the timeliness of the demands for redelivery at issue in this action. But none of the Government's arguments casts a different light on the long and consistent line of rulings by Customs Headquarters discussed above.

#### a. The Government's Claims of Compliance With 19 C.F.R. § 113.62(d)

The Government first invokes 19 C.F.R. § 113.62(d), which requires (in relevant part) that "any demand for redelivery . . . be made no later than . . . 30 days after the end of the conditional release period." *See* 19 C.F.R. § 113.62(d). The Government asserts that "nothing in the language of § 113.62(d) . . . prevent[ed] [the individual Customs staffer at issue in this action] from extending the conditional release period so long as a demand for redelivery is made within 30 days after the [conditional release] period ends." *See* Pl.'s Opposition to Motions to Dismiss at 5; *see also id*. at 10. However, the Government's position is squarely at odds with settled agency practice.

Although the Government seeks to focus on the language of 19 C.F.R. § 113.62(d), the text of the regulation itself, standing alone, is not determinative, because the regulation leaves the term "conditional release period" undefined. Pressman-Gutman points to the "consistent and longstanding interpretation[]" of § 113.62(d) reflected in the rulings of Customs Headquarters, holding that the "conditional release period" ends with Customs' receipt of a requested sample and requiring the issuance of any demand for redelivery within 30 days thereafter. *See* Pressman-Gutman Motion to Dismiss at 2; *see generally id*. at 6-17 (analyzing long line of rulings by Customs Headquarters interpreting "conditional release period" as that phrase is used in 19 C.F.R. §

113.62(d)); Pressman-Gutman Reply at 2, 3 n.4, 7, 9-10 (same).

In contrast to the Customs Headquarters rulings cited by Pressman-Gutman, the Government

cites no case law or Headquarters rulings (or any other authority) to refute Pressman-Gutman's

claim that the conditional release periods ended when Customs received the requested samples in

this case.  Nor does the Government point to any authority whatsoever to support the notion that a

Customs staffer could subsequently commence *new* conditional release periods[6]

---

[6]The Government characterizes the purported effect of the Requests for Information (CF 28s)
issued in October 1999 as "extending" the "conditional release periods" in this case, employing the
same terms that were used on the CF 28s themselves.  *See, e.g.*, Pl.'s Opposition to Motions to
Dismiss at 6 (referring to the "extension of the conditional release period"); *see also*
Complaint, Exhs. 5, 14 (CF 28s stating, *inter alia*, "Conditional release period extended for 90 days").  But the
Government uses both terms incorrectly and inconsistently at various points in its brief.  As
summarized below, the Government repeatedly mistakes the concept of the "conditional release
period."  Similarly, it would be more accurate for the Government to speak of triggering a "new"
conditional release period, rather than an "extension."  Because the "conditional release period" had
already expired here by the time the individual Customs staffer in this case took action, there could
be no "extension" of that period in the case at bar.  The lack of precision in the Government's
language and the lack of rigor in its analysis render the Government's case as confusing as it is
lacking in merit.

For example, the Government asserts that "[w]ithin 30 days after merchandise imported by
Pressman was *conditionally released* from Customs' custody, Customs notified Pressman that the
merchandise was *conditionally released* and that Pressman should submit samples of the
merchandise to Customs."  *See* Pl.'s Opposition to Motions to Dismiss at 2 (emphases added); *see
also id.* at 5 (stating that "[w]ithin 30 days after *conditional release* of the imported merchandise,
Customs requested Pressman to submit samples of the merchandise, and informed Pressman that the
merchandise is *conditionally released*") (emphases added).  The Government thus fails to clearly
distinguish between the initial "release" of merchandise and the "conditional release" of
merchandise.  *See, e.g.*, 19 C.F.R. § 113.62(d) (referring to the initial "release[]" of merchandise,
as well as to "the conditional release period").

Similarly, the Government's brief states that one of the two issues presented by the case at
bar is "[w]hether Customs, acting within 30 days after the conditional release period *commenced*,
could extend that period . . . "  *See* Pl.'s Opposition to Motions to Dismiss at 2 (emphasis added).
But nowhere in its brief does the Government argue that the "conditional release period" *commenced*

_____

at some time other than when Customs *requested* the samples from Pressman-Gutman. Further, the Government's argument in this case focuses not on when the samples were *requested*, but, rather, on when they were *received*.

Specifically, the Government predicates its claim in this matter on the fact that the CF 28s ostensibly "extending" the conditional release periods were issued within 30 days after the requested samples were *received* by Customs. *See*, *e.g.*, Pl.'s Opposition to Motions to Dismiss at 10 (asserting that "within 30 days after the samples were received by Customs, Pressman was notified that the conditional release period was extended by 90 days," and arguing that "[n]one of the authorities relied on by Pressman addressed a situation in which Customs, within 30 days after receipt of samples of merchandise, notified the importer that the conditional release period was extended"); *see also*, *e.g.*, *id*. at 9 (emphasizing that "[w]ithin 30 days after Pressman submitted the samples, Customs notified Pressman . . . that the conditional release period was extended"); *id*. at 5 (emphasizing that CF 28s purporting to extend the conditional release periods were issued "within 30 days after . . . receipt of the samples of merchandise"); *id*. (stating that "[w]ithin 30 days after Pressman submitted the samples, Customs notified Pressman . . . that the conditional release period was extended for 90 days").

To be sure, as explained elsewhere herein, the phrase "conditional release period" (as used in 19 C.F.R. § 113.62(d)) is a term of art; and its proper, technical definition may seem counter-intuitive (even misleading) to anyone who is not a seasoned practitioner of customs law. As Customs Headquarters has defined the phrase, "conditional release period" notably does not refer to the 30-day period following Customs' initial release of merchandise, when Customs may demand redelivery of merchandise; nor does "conditional release period" refer to the 30-day period following Customs' receipt of a requested sample, when Customs also may demand redelivery. Instead, as detailed above, Customs Headquarters interprets the phrase "conditional release period" as the term is used in § 113.62(d) to refer solely to the period between Customs' request for a sample of merchandise and Customs' receipt of the requested sample. Nevertheless, throughout its brief, the Government repeatedly misuses the phrase "conditional release period." *See*, *e.g.*, Pl.'s Opposition to Motions to Dismiss at 13 (in discussion of HQ 119541, asserting that the "conditional release period" *expired* "30 days after receipt of the samples").

In any event, sloppy verbiage aside, the Government here does not actually dispute that, in a case such as this, the conditional release period *begins* when Customs *requests* a sample from the importer. More to the point, as discussed above, although the Government at least implicitly disputes that the conditional release period *ends* when Customs *receives* the requested samples, the Government has cited no authority to support that position. Indeed, the Government cannot do so.

It is thus misleading for the Government to speak of "extending" the conditional release period in this case. *See*, *e.g.*, Pl.'s Opposition to Motions to Dismiss at 2 (referring to "the extended

(whether by issuing a CF 28 (Request for Information) purporting to do so, or otherwise).  Nor can

the Government do so.  Interpreting applicable Customs regulations, Customs Headquarters has

authoritatively and consistently ruled – in cases such as this – that the conditional release period

begins when a sample is requested by Customs and ends when the sample is received, and that any

demand for redelivery must be made within 30 days thereafter.  Contrary to the Government's

implication, the consistent, unequivocal, and unambiguous rulings of Customs Headquarters on this

point leave no room for any alternative interpretation of the phrase "conditional release period" or

any other part of 19 C.F.R. § 113.62(d) as that regulation applies here.

Thus, under the extant Customs Headquarters rulings, the demands for redelivery in this case

were untimely, as Pressman-Gutman claims.  Pursuant to the unambiguous and unequivocal holdings

of those Headquarters rulings, the conditional release periods in this case began on September 29,

---

conditional release period"); *id*. at 5 (asserting that "Customs extended the conditional release
period"); *id*. at 10 (arguing that "nothing . . prevents Customs from extending the conditional release
period"); *id*. at 11 (stating that "Customs extended the conditional release period"); *id*. at 15 (stating
that "the conditional release period was extended");  *id*. at 16 (referring to the "extension of the
conditional release period"); *id*. at 17 (referring to "[t]he extension of the conditional release
period"); *id*. at 20 (referring to the "extension of the conditional release periods").  The conditional
release periods for the first and second entries ended, respectively, on or before October 15, 1999
and on or before October 25, 1999, when Customs *received* the requested samples.  *See* section I.A,
*supra*.  The CF 28s purporting to "extend" the conditional release periods for the two entries – which
are dated October 15, 1999 and October 25, 1999, respectively, and which acknowledge Customs'
receipt of the samples – thus were not issued until *after* the conditional release periods had expired.
*Id*.  And, metaphysically-speaking, one cannot "extend" that which has already expired.

In short, as Pressman-Gutman puts it, by the time the October 1999 CF 28s were issued,
"there were no existing conditional release periods to 'extend.'"  *See* Pressman Gutman Reply at 12.
Therefore, even assuming, *arguendo*, that the Customs staffer in this case (and other individual
Customs staffers at ports all across the country) had the power to "extend" conditional release
periods, no such "extension" would have been possible in the instant case, because the conditional
release periods here had already ended before the Customs staffer took action.

1999 and October 15, 1999 (when Customs requested samples from the first and second entries, respectively), and ended when Customs received the samples from Pressman-Gutman at some point before October 15, 1999 and October 25, 1999 (the dates when Customs acknowledged receipt of the samples). The demands for redelivery were not issued until February 8, 2000, however – much more than 30 days after the samples were received (ending the respective conditional release periods).

Significantly, there is no claim here that Customs Headquarters could not interpret the phrase "conditional release period" (as it is used in 19 C.F.R. § 113.62(d)) to extend beyond Customs' receipt of samples. Pressman-Gutman argues only that Customs Headquarters has resolutely declined to do so in the past. There is therefore no need to reach that question here.[7]

To be sure, Customs – like any agency – is free to change its interpretation of its regulations. But any such change in interpretation must be effected properly, in accordance with the law. As the U.S. Court of Appeals for the D.C. Circuit has underscored, "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately

---

[7]Similarly, in light of the analysis herein and the ultimate disposition of this matter below, there is no need to reach Pressman-Gutman's claim that Customs Headquarters' long-held and well-settled interpretation of the regulations at issue is entitled to deference, and – as such – should prevail over any assertedly new interpretation. *See* Pressman-Gutman Reply at 2-7. At first blush, it seems more than passing strange to have a claim of deference to an agency's interpretation of a regulation raised by a party other than the agency that rendered that interpretation (particularly where, as here, the litigation is against the agency). However, while it is much more common for a deference claim to be asserted by an agency, nothing inherently precludes a private litigant such as Pressman-Gutman from doing so. *See*, *e.g.*, American Federation of State, County & Municipal Employees v. American Int'l Group, Inc., 462 F.3d 121, 129 (2d Cir. 2006) (AFSCME v. AIG) (deferring, at urging of private litigant, to agency's longstanding interpretation of regulation over agency's new interpretation).

changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." Bush-Quayle '92 Primary Committee, Inc. v. Federal Election Comm'n, 104 F.3d 448, 453 (D.C. Cir. 1997) (*quoting* Greater Boston Tel. Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970)); Grace Petroleum Corp. v. Federal Energy Regulatory Comm'n, 815 F.2d 589, 591 (10th Cir. 1987) (same). Thus, "[a]n agency interpretation that would otherwise be permissible is, nevertheless, prohibited when the agency has failed to explain its departure from prior precedent." Bush-Quayle '92 Primary Committee, 104 F.3d at 453 (citations omitted).

In the case at bar – as in Acadian Gas – the agency "has failed to acknowledge even that a departure from past practice has occurred," much less to proffer any rationale for the change. *See* Acadian Gas Pipeline Sys. v. Federal Energy Regulatory Comm'n, 878 F.2d 865, 868 (5th Cir. 1989) (rejecting agency's "newly stated interpretation" as "an arbitrary, capricious departure from past practice").[8] There is no indication that the individual Customs staffer in this case recognized that

---

[8]*See also*, *e.g.*, AFSCME v. AIG, 462 F.3d at 129 (criticizing agency's *amicus* brief for "fail[ing] to so much as acknowledge a changed position, let alone offer a reasoned analysis of the change").

The facts of this case and the history of Customs Headquarters' interpretation of the relevant regulations suggest the possibility that the agency's past interpretation was not only not intended to be "deliberately changed" here; it was not even being "casually ignored." *See* Bush-Quayle '92 Primary Committee, 104 F.3d at 453. Rather, it seems at least possible that the Customs staffer here was simply ignorant of Customs Headquarters' long-held and oft-reiterated interpretation. *See* Harrington v. Chao, 280 F.3d 50, 59-60 (1st Cir. 2002) (observing that, where the agency's "Statement of Reasons fail[ed] to explain whether [the agency] [was] departing from [its] prior course and, if so, the reasons for the change," the record did not even permit court to determine whether agency actually intended to do an "about face" on its interpretation of regulation; noting that "it is not clear on this record that the [agency] is in fact repudiating [its] prior interpretations here"); *cf.* AFSCME v. AIG, 462 F.3d at 129 (criticizing agency's *amicus* brief for "fail[ing] to so

the demands for redelivery here were bucking 20 years of settled Customs Headquarters precedent.

Moreover, the record reveals nothing special or unusual about these transactions.  Nor is there any indication of any significant changes in circumstances in the trade or in the regulatory environment which might suffice to justify a change in Customs' interpretation of the regulations at issue.  *See*, *e.g.*, Harrington v. Chao, 280 F.3d. 50, 60-61 (1st Cir. 2002) (holding that Labor Department's rationale for change in interpretation of agency regulation at issue must "explain whether *changing labor market economics* justify a modification of prior interpretation or a *building construction trades exception* to it, or what the other reasons for the change are") (emphases added).[9]

_____

much as acknowledge a changed position, let alone offer a reasoned analysis of the change"). However, while ignorance might (in some measure) excuse the actions of an individual Customs staffer working out in the "field," it does nothing to explain the agency's subsequent determinations, much less the decisions of counsel to press an untenable position in litigation.

[9]*See also*, *e.g.*, AFSCME v. AIG, 462 F.3d at 129 (2d Cir. 2006) (explaining that "the SEC has substantial discretion to adopt new interpretations of its own regulations in light of, for example, *changes in the capital markets* or even simply because of a shift in the Commission's regulatory approach," provided that the agency adequately "'explain[s] its departure from prior norms'") (emphasis added; citation omitted); Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n, 59 F.3d 284, 291 (1st Cir. 1995) (rejecting agency's "new policy" as "arbitrary and capricious" and "irrational" where agency failed to "set forth any *new facts*, *fresh information*, or *changed circumstances* which would counsel the shift") (emphases added).

In its landmark ruling in Atchison, Topeka & Santa Fe Railway Co., the U.S. Supreme Court emphasized the importance of a clear and well-reasoned justification for any deviation from prior agency practice:

A settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress.

There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to.  From this presumption flows the agency's duty to explain its departure from prior norms. . . . The agency may flatly repudiate those norms, deciding, for example, that *changed circumstances* mean that they are no longer

As discussed above, concerns about the difficulty of completing analyses within 30 days of Customs' receipt of samples had been raised within the agency long before the events at issue here, and were recognized but overruled by Customs Headquarters in formulating the agency's interpretation of its regulations.[10]

---

> required in order to effectuate congressional policy. Or it may *narrow the zone in which some rule will be applied*, because it appears that a more discriminating invocation of the rule will best serve congressional policy. Or it may find that, although the rule in general serves useful purposes, *peculiarities of the case before it* suggest that the rule not be applied in that case. Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.

Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade, 412 U.S. 800, 807-08 (1973) (emphases added).

[10]The Government seeks to make much of the language added to the CF 28s (Requests for Information) issued to Pressman-Gutman, which stated that failure to retain the imported merchandise "[could] result in liquidated damages." *See* Pl.'s Opposition to Motions to Dismiss at 2-5, 9, 11-12, 20-21; Complaint ¶¶ 13, 25, Exhs. 5, 14. However, in light of Customs Headquarters' well-settled and longstanding interpretation of the agency's regulations on the timing of demands for redelivery, the purported warnings on the Requests for Information were of no real moment. Under the circumstances, it is difficult to fault Pressman-Gutman for honoring its contractual obligations to its customers – obligations which were predicated on Customs Headquarters' well-settled and longstanding interpretation of the regulations.

Even if Customs had undertaken to articulate a proper, well-reasoned basis for reversing its longstanding regulatory interpretation here (which it plainly did not), Pressman-Gutman's contractual obligations to its customers might well have precluded Customs from giving effect to such a changed interpretation in this case. *See generally* Pressman-Gutman Motion to Dismiss at 21 (emphasizing that "[w]here, as here, Customs Headquarters clearly, publicly, and repeatedly communicated that Customs must issue a redelivery notice within thirty-days of receiving a sample, regulated parties are not on notice that the government can request redelivery over three months after it receives samples"). It is black-letter law that considerations of "administrative equity" prohibit agencies from "'impos[ing] undue hardship by suddenly changing direction, to the detriment of those who have relied on past policy.'" Acadian Gas, 878 F.2d at 870 (*quoting* Cities of Anaheim, Riverside, Banning, Colton and Azusa v. Federal Energy Regulatory Comm'n, 723

In sum and substance, the Government here contends that individual Customs personnel at ports all across the country are empowered to redefine the concept and duration of the conditional release period "by unilateral fiat" and without explanation, as each individual sees fit, on a case-by-case basis, with no regard for consistency or predictability, effectively over-riding on a "one-off" basis virtually two full decades of Customs Headquarters rulings setting forth Headquarters' official, considered interpretation of the agency's regulations governing the timing of the issuance of demands for redelivery. Merely to state the proposition is to refute it. *Compare*, *e.g.*, Pl.'s Opposition to Motions to Dismiss at 5 (asserting that "nothing in the language of § 113.62(d) . . . prevents [an individual Customs staffer] from extending the conditional release period so long as a demand for redelivery is made within 30 days after the [conditional release] period ends") *and* Pressman-Gutman Motion to Dismiss at 2 (characterizing this as a case where "a single Customs employee sought by unilateral fiat to extend the 'conditional release' period"); *see also id.* at 3, 16, 19, 21, 23; Pressman-Gutman Reply at 1, 4, 7, 8, 13-14.

---

F.2d 656, 659 (9th Cir. 1984)); *see also*, *e.g.*, United States v. Midwest Oil Co., 236 U.S. 459, 472-73 (1915) (noting that "government is a practical affair, intended for practical men," and recognizing that "[b]oth officers, law-makers and citizens naturally adjust themselves to any long-continued action of the Executive [Branch]"); Nat'l Corn Growers Ass'n v. Baker, 840 F.2d 1547, 1555 (Fed. Cir. 1988) (stating that "[t]he law is the law at the time of its existence, . . . and 'practical men' have a right to rely on it at the time they perpetrate their actions"); Shikoku Chems. Corp. v. United States, 16 CIT 382, 388 & n.8, 795 F. Supp. 417, 421-22 & n.8 (1992) (and cases cited there) (same); *cf.* Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 742 (1996) (explaining – in case involving alleged change in agency interpretation of statute – that "the mere fact that an agency interpretation contradicts a prior agency position is not fatal"; however, "[s]udden and unexplained change" or "change that does not take account of legitimate reliance on prior interpretation . . . may be 'arbitrary, capricious, [or] an abuse of discretion'").

b.  <u>The Government's Claims of Compliance With 19 C.F.R. § 141.113(c)</u>

Apart from its argument based on 19 C.F.R. § 113.62(d) (discussed above), the Government

also invokes the other regulation at issue – § 141.113(c), which requires Customs to make demands

for redelivery "promptly."  *See* 19 C.F.R. § 141.113(c).  Specifically, the Government asserts that

"[n]o specific time limit is provided for the port director to demand redelivery . . . , but only that the

demand for redelivery be made 'promptly.'"  *See* Pl.'s Opposition to Motions to Dismiss at 6; *see*

*also id*. at 14.  The Government thus maintains that "[the Customs staffer's] actions here complied

with . . . 19 C.F.R. § 141.113(c)."  *See* Pl.'s Opposition to Motions to Dismiss at 6; *see also id*. at

14.  Again, however, the Government's argument ignores Customs Headquarters' established

interpretation of the agency's regulation.

The Government cites no authority whatsoever to support its claim that the demands for

redelivery in this case were made "promptly," as required by 19 C.F.R. § 141.113(c).  Nor can the

Government do so.  Interpreting applicable Customs regulations, Customs Headquarters has

authoritatively and consistently ruled that – in cases such as this – "promptly" means no later than

30 days following the agency's receipt of requested samples.[11]  Contrary to the Government's

implication, the consistent, unequivocal, and unambiguous rulings of Customs Headquarters on this

point leave no room for any alternative interpretation of the term "promptly" or any other part of 19

C.F.R. § 141.113(c) as that regulation applies here.

---

[11]The Government cannot cite even a single ruling where, in a situation such as this, Customs Headquarters has interpreted 19 C.F.R. § 141.113(c) as authorizing the issuance of a demand for redelivery more than 30 days following the agency's receipt of a requested sample.

Thus, under the extant Customs Headquarters rulings, the demands for redelivery in this case were not made "promptly," contrary to the Government's claims.  Under  the clear holdings of the rulings of Customs Headquarters, the requirement in 19 C.F.R. § 141.113(c) that demands for redelivery be made "promptly" mandates that, in a case such as this, any such demands be issued no later than 30 days following the agency's receipt of requested samples.  In the instant case, Customs received the samples from Pressman-Gutman no later than October 15, 1999 and October 25, 1999 (when Customs acknowledged receipt of the samples from the first and second entries, respectively).  However, the demands for redelivery were not issued until February 8, 2000 – much more than 30 days later.

Customs (like any other agency) is, of course, free to change its interpretation of its regulations – *provided* that the agency follows the proper procedure, which Customs in this instance did not.  *See generally* section I.C.1.a, *supra* (summarizing procedural and substantive legal requirements to be met where agency wishes to change its interpretation of a regulation).  Pressman-Gutman notably does not claim that Customs Headquarters could not interpret the term "promptly" (as that term is used in 19 C.F.R. § 141.113(c)) to mean a period of *more than* 30 days following Customs' receipt of samples.  Pressman-Gutman argues only that Customs Headquarters has repeatedly refused to adopt such an interpretation in the past.  That suffices to resolve the issue presented here.

      c.  <u>The Government's Claim That "Other Appropriate Action" Was Taken</u>

In what seems to be its principal argument for the timeliness of the demands for redelivery in this case, the Government seizes on a phrase that appears in an internal agency memorandum and in two Customs Headquarters rulings (all of which date back nearly two decades), indicating that "Customs has an additional 30 days from the date of receipt of the sample within which to demand redelivery *or take other appropriate action*." *See* Pl.'s Opposition to Motions to Dismiss at 5 (emphasis added); *see also id*. at 10-13, 21; Memorandum to Deputy Commissioner of Customs from Assistant Commissioner, Office of Commercial Operations, re: "C.S.D. 90-99, Demand for Redelivery of Merchandise" (Sept. 3, 1991) ("September 3, 1991 Memo"); HQ 223315 (Sept. 4, 1991); HQ 223535 (Sept. 21, 1992).

The Government's theory is that the demands for redelivery at issue in this action are valid even though the demands were not made within 30 days of the agency's receipt of Pressman-Gutman's samples, because a Customs staffer at the Port of JFK Airport instead took "other appropriate action" by "notif[ying] Pressman (by way of Form 28) that the samples had been sent to the laboratory for analysis, and that the conditional release period was extended for 90 days pending laboratory analysis of the samples." *See* Pl.'s Opposition to Motions to Dismiss at 11; *see also id*. at 5, 10-13.  Significantly, however, the Government cites no case law or Customs Headquarters rulings to support its claim that the actions of the Customs staffer here excused the agency from issuing a demand for redelivery within 30 days of the agency's receipt of the requested samples.  Nor is there any authority to suggest that the reference to "other appropriate action" in any of the three documents was intended to effectively eviscerate the hard-and-fast 30-day limitation on

the issuance of demands for redelivery set forth in 20 years of Customs Headquarters rulings.  In fact, all authority is quite to the contrary.

The Government points to a September 3, 1991 memo from the Assistant Commissioner of the Office of Commercial Operations, addressed to the Deputy Commissioner of Customs, transmitting a draft of HQ 223315 (which is the Deputy Commissioner's response to a letter from the Northern Border Customs Brokers Association seeking clarification as to the effect of C.S.D. 90-99 (HQ 732043) on the limitations on the timing of demands for redelivery).  *See* September 3, 1991 Memo; Pl.'s Opposition to Motions to Dismiss at 11-12; *see also* Pressman-Gutman Reply at 9 n.7.[12]  The September 3, 1991 Memo states, in relevant part:

> Customs has only 30 days from the date of release [of merchandise] within which to request a sample; plus, an additional 30 days from the date of receipt of the sample within which to demand redelivery or take any *other appropriate action*. . . .
>
> . . . The additional 30 days [after the agency receives a sample] may not be sufficient for Customs to make a determination as to whether it will demand redelivery or take any *other appropriate action*.  For instance, if a computer chip is forwarded to Technical Services to determine if the software on a computer chip violates any copyrights, 30 days may not be sufficient time for the lab to complete its review. The same may hold true if the import specialist sends a sample garment to the lab to determine the fabric content. . . .

September 3, 1991 Memo (emphases added).[13]  Highlighting the Memo's references to "other appropriate action," the Government characterizes the Memo as "address[ing] . . . the issue in the

---

[12]There is no indication as to what changes, if any, were made between the draft letter transmitted by the September 3, 1991 Memo and the letter that the Deputy Commissioner of Customs actually issued the following day as HQ 223315.

[13]A copy of the September 3, 1991 Memo is appended to Plaintiff's Opposition to Motions to Dismiss as Plaintiff's Exhibit No. 18.

case at bar – the need for additional time when a laboratory analysis of the imported merchandise cannot be completed within 30 days after receipt of a sample of merchandise." *See* Pl.'s Opposition to Motions to Dismiss at 11-12.

The Government's reliance on the September 3, 1991 Memo is misplaced, however. And, like the Government's other arguments, this argument too cannot withstand scrutiny. While it is not clear from the record in this action exactly what is contemplated by the phrase "other appropriate action," it is abundantly clear that the phrase does not license what the Customs staffer did in this case.

HQ 223535 definitively disposes of the Government's theory. *See* HQ 223535 (Sept. 21, 1992) (entitled "Issuance of Guidelines on the Time in which Demand for Redelivery Must be Made"). As explained above in the introduction to this section (*i.e.*, section I.C), HQ 223535 memorializes the recommendation of the Director of the Commercial Rulings Division in Customs Headquarter's Office of Regulations and Rulings that a Customs Directive be issued to agency personnel in the field concerning "the time within which Customs may demand redelivery of merchandise." *See* HQ 223535. HQ 223535 specifically refers to HQ 223315 (dated September 4, 1991) – the final version of the draft letter transmitted by the September 3, 1991 Memo on which the Government relies – and expressly restates the position set forth in HQ 223315 (that is, that "Customs has 30 days from the release of merchandise within which to request information about, or a sample of, the merchandise," and that "[i]f such a request is made, Customs has a second 30-day period from the date of receipt of the information or sample within which to demand redelivery or *take other appropriate action*"). *See* HQ 223535 (emphasis added); *see also* HQ 223315; September

3, 1991 Memo.  In the very next paragraph, however, HQ 223535 states flatly and unequivocally

– with no hedging whatsoever – that the regulatory requirement that a demand for redelivery be

issued "promptly" means that any such demand must be issued "within 30 days from the date of

receipt by Customs of the [requested] information or sample."  Period.  Full stop.  *See* HQ 223535.

Thus, whatever other measure(s) the phrase "other appropriate action" may authorize, HQ

223535 makes it clear that, contrary to the Government's assertions, that phrase cannot be read to

alter in any way Customs Headquarters' strict requirement that any demand for redelivery be made

no later than 30 days after the agency's receipt of a requested sample (or other information).  To the

same effect are numerous other Customs Headquarters rulings that post-date the September 3, 1991

Memo, which – like HQ 223535 – state flatly (with no hedging, no caveat, no equivocation, and no

reservation) that any demand for redelivery must be issued within 30 days after Customs' receipt

of a sample or other requested information.  Those additional rulings include HQ W968383, which

Customs Headquarters issued even as the Government was preparing its response to Pressman-

Gutman's Motion to Dismiss in this action.  *See* Pressman-Gutman Reply at 11 (emphasizing that,

"after [Pressman-Gutman] filed its Motion to Dismiss, Customs Headquarters again rejected efforts

by the Port of JFK to enforce a redelivery notice more than thirty days after Customs received a

sample"); HQ W968383 (March 2, 2007) (explaining that regulatory requirement that demand for

redelivery be made "promptly" mandates that, "if information or a sample is requested," any demand

for redelivery must be issued "within thirty days from the date of receipt by [Customs] of the

information or sample").[14]

As discussed above, HQ 223535 and the language of numerous other rulings by Customs Headquarters that post-date the September 3, 1991 Memo belie the Government's claim that the Memo's reference to "other appropriate action" can be read to authorize the issuance of a demand for redelivery more than 30 days after Customs' receipt of a requested sample. Those Customs Headquarters rulings alone are enough to rob the Government's argument of any persuasive force. But the Government's characterization of the September 3, 1991 Memo as a document addressing "the issue in the case at bar – the need for additional time when a laboratory analysis of the imported merchandise cannot be completed within 30 days after receipt of a sample of merchandise" – also warrants comment. *See* Pl.'s Opposition to Motions to Dismiss at 11.

At times, the Government seems to intimate that Customs Headquarters is ignorant of, or has been deaf to, the concerns of Customs personnel that, in some cases (as in this case), analysis may not be completed within 30 days after Customs' receipt of samples. To the contrary, Customs

---

[14]*See also*, *e.g.*, HQ 224566 (Aug. 3, 1993) (stating that, "if information or a sample is requested," any demand for redelivery must be made "within 30 days from the date of receipt by Customs of the information or sample"); HQ 225319 (July 26, 1994) (same; voiding demand for redelivery which was issued "well beyond the 30-day time period" following Customs' receipt of sample, holding that demand for redelivery was not issued "promptly" and was therefore "untimely"); HQ 226218 (March 19, 1996) (explaining that regulatory requirement that demand for redelivery be made "promptly" mandates that, "if information or a sample is requested," any demand for redelivery must be issued "within 30 days from the date of receipt by Customs of the information or sample"); HQ 115941 (May 15, 2003) (voiding demands for redelivery which were "not timely" and therefore "unenforceable" because they were issued "well beyond the 30-day allowable period"; stating that "[a] demand for redelivery must be made no later than 30 days after the sample is received"); HQ 114693 (Dec. 10, 1999) (voiding demand for redelivery as untimely; explaining that "Customs had thirty days from [the date of receipt of the requested sample] to make a valid demand for redelivery," but failed to do so).

Headquarters has expressly acknowledged those concerns (in the September 3, 1991 Memo, and thereafter), and has nevertheless elected to repeatedly reinforce the 30-day limitation on issuance of demands for redelivery.

In HQ 951300, for example, Customs Headquarters responded to a request for reconsideration of HQ 088904 made by the District Director of the Port of Charleston. *See* HQ 951300 (Aug. 3, 1993) (expressly acknowledging that 30 days may be insufficient to complete analysis in some cases, but nevertheless reaffirming 30-day limitation on issuance of demand for redelivery); *see also* HQ 088904 (Feb. 19, 1992). In ruling on the request for reconsideration, Customs Headquarters explicitly recognized "[t]he danger of limiting the time period to decide admissibility to 30 days from the receipt of the sample," and noted that the concern had been raised and considered even prior to the issuance of HQ 223315 on September 4, 1991, and, moreover, had been raised with the Assistant Commissioner once again in the context of the District Director's request for reconsideration. *See* HQ 951300; HQ 223315 (Sept. 4, 1991). Still, HQ 951300 advised that "the Assistant Commissioner upheld the prior position on the time in which demand for redelivery must be made." *See* HQ 951300. Indeed, in its rulings, Customs Headquarters has emphasized time and again that its position limiting the time for issuance of a demand for redelivery has been "thoroughly considered." *See*, *e.g.*, HQ 951300 (explaining that "the matter was thoroughly considered prior to the issuance of HQ 088904"); HQ 225319 (July 26, 1994) (stating that Customs' Headquarters' "interpretation of [19 C.F.R. § 113.62(d) and § 141.113(c)] has been thoroughly considered"); HQ W968383 (March 2, 2007) (same); HQ 226218 (March 19, 1996) (stating that "Customs has thoroughly considered the interpretation of [19 C.F.R. § 113.62(d) and

§ 141.113(c)]").

In short, contrary to the Government's implication, Customs Headquarters has long been keenly aware of the fact that, in some cases (like this one), analysis may not be completed within 30 days after the agency receives requested samples. Nevertheless, Customs Headquarters has repeatedly and consistently ruled that any demands for redelivery must be made within that 30-day period; and Customs Headquarters has not hesitated to void demands for redelivery issued thereafter. *See, e.g.*, HQ 114693 (Dec. 10, 1999) (voiding as "not timely" and "unenforceable" a demand for redelivery made more than 30 days following Customs' receipt of sample, even though Customs did not receive lab report until after 30-day period had expired).[15]

The Government also conspicuously fails to explain why – if, in fact, the 30-day limitation on issuance of a demand for redelivery could be avoided simply by a Customs staffer's unilateral issuance of a CF 28 imposing a further conditional release period of some duration, at the staffer's discretion – that option was never articulated or identified as "other appropriate action" in even a single Customs Headquarters ruling issued over the past two decades, particularly since such an option would have allayed anxious agency staffers.[16] The 30-day limitation on issuance of a demand

_____

[15] *See also, e.g.*, HQ 115941 (May 15, 2003) (voiding as "not timely" and "unenforceable" two demands for redelivery made more than 30 days following Customs' receipt of samples, even though Customs did not receive National Commodity Specialist's determination until after 30-day period had expired); HQ 225319 (July 26, 1994) (voiding demand for redelivery made more than 30 days after Customs' receipt of sample).

[16] Certainly this was not the first case where analysis was not completed within the 30-day period following Customs' receipt of samples. *See, e.g.*, HQ 114693 (Dec. 10, 1999) (voiding as "not timely" and "unenforceable" a demand for redelivery made more than 30 days following Customs' receipt of sample, even though lab report was not issued within 30 days of lab's receipt of sample; sample was received and forwarded to lab on August 14, 1997, but lab report was dated

for redelivery would have generated much less concern among Customs personnel if it could be so readily circumvented.   *See*, *e.g.*, Pressman-Gutman Reply at 9 (underscoring the "lengthy deliberative process in which Customs Headquarters promulgated its strict 30 day rule despite *widespread dissent among the agency's rank and file*") (emphasis added).[17]

                d.   The Government's Attempts to Distinguish This Case on Its Facts

In addition to the legal arguments that it advances, the Government also attempts to distinguish the facts of this case from those in the long and unbroken line of Customs Headquarters rulings on which Pressman-Gutman relies.   *See generally*  Pl.'s Opposition to Motions to Dismiss

---

September 15, 1997); *see also*, *e.g.*, HQ 225319 (July 26, 1994) (sample was provided to Customs on December 22, 1993, national import specialist's report was received by Customs on February 2, 1994, and demand for redelivery was made February 14, 1994 – "well beyond the 30-day time period"; demand for redelivery voided as "untimely"); HQ 115941 (May 15, 2003) (samples were received by Customs on February 2, 2000 and March 8, 2000, and report of national commodity specialist was received on April 17, 2000; demands for redelivery, issued April 25, 2000, were "well beyond the 30-day allowable period" and were therefore voided as "not timely" and "unenforceable").

If the phrase "other appropriate action" was intended to be the "relief valve" that the Government contends, it is reasonable to expect that other Customs rulings would have addressed it, and that other Customs personnel would have invoked it from time to time, as necessary, over the course of the past 20 years or so.  It is telling that they have not done so.

[17]*See also*, *e.g.*, September 3, 1991 Memo (recognizing practical concerns within Customs that, in some instances, "30 days may not be sufficient for Customs to make a determination" on admissibility of merchandise; positing that "if a computer chip is forwarded to Technical Services to determine if the software on a computer chip violates any copyrights, 30 days may not be sufficient time for the lab to complete its review.  The same may hold true if the import specialist sends a sample garment to the lab to determine the fabric content."); HQ 951300 (Aug. 3, 1993) (acknowledging reservations voiced by District Director of Customs at Port of Charleston, who warned of "[t]he danger of limiting the time period to decide admissibility [of merchandise] to 30 days from the receipt of the sample").

at 10, 13-15; *see also id*. at 20 (asserting that instant case is "not in conflict with the earlier rulings" by Customs Headquarters).  Specifically, the Government tries to make much of the fact that "[n]one of the authorities relied on by Pressman addressed a situation in which Customs, within 30 days after receipt of samples of merchandise, notified the importer that the conditional release period was extended to allow for laboratory analysis of the samples."  *See id*. at 10.  But the Government's broad-brush attempts to dismiss the impressive line of Customs Headquarters precedent are unavailing.

It is true that, as the Government indicates, there is no ruling by Customs Headquarters "on all fours" with the facts of this case.  However, contrary to the Government's implication, the anomalous nature of these facts affords no support for the Government's position.  The Government makes no claim that, prior to this case, any Customs staffer has ever even attempted to affirmatively impose a conditional release period beyond the agency's receipt of requested samples.  The fact that no such case is reflected in approximately two decades of rulings by Customs Headquarters speaks volumes to the uniformity, clarity, and decisiveness of Headquarters' long-held and oft-repeated position on the timing of the issuance of demands for redelivery.[18]

---

[18]As discussed above, there are a large number of Customs Headquarters rulings addressing the timeliness of demands for redelivery; and, in a significant portion of those rulings, the demand for redelivery is voided on the grounds that the demand was not made within 30 days after the agency's receipt of a requested sample.  If the problem of untimely demands for redelivery could be prevented as readily as the Government here suggests (*i.e.*, by the issuance – at an individual Customs staffer's discretion – of a CF 28 imposing a further conditional release period of some duration beyond the agency's receipt of a requested sample), one would expect that the point surely would have been raised in at least one of the many Customs Headquarters rulings on this issue over the last 20 years.  However, the Government cannot cite even one such ruling.

D. <u>Summary</u>

In this action, the Government seeks to collect $120,000 in liquidated damages from Pressman-Gutman and AMICO, for Pressman-Gutman's alleged breach of the terms of its customs bond. According to the Government's Complaint, Pressman-Gutman breached the terms of its bond by failing to return two entries of merchandise to Customs' custody notwithstanding demands for redelivery of the goods. As discussed above, however, the demands for redelivery were issued more than 30 days after Customs' receipt of requested samples, when the "conditional release period" ended. The demands for redelivery were thus untimely and invalid, and Pressman-Gutman's failure to make redelivery did not constitute a breach of the terms of its bond.

Absent a breach of the terms of Pressman-Gutman's customs bond, the Government cannot maintain this action for liquidated damages against Pressman-Gutman or AMICO. Even taking as true all factual allegations in the Government's Complaint and drawing all inferences in the Government's favor, there is no set of facts that, if proved, would entitle the Government to the relief sought. The Complaint therefore fails to state a claim. Accordingly, pursuant to USCIT Rule 12(b)(5), Pressman-Gutman's Motion to Dismiss and AMICO's Cross-Motion to Dismiss must be granted, and the Government's Complaint dismissed.

## II. **AMICO's Cross Motion for Collateral Security and Attorney's Fees**

Besides joining in Pressman-Gutman's Motion to Dismiss, AMICO also seeks other relief by cross-motion. *See* AMICO Cross-Motion at 1-2, 5-7. AMICO first requests that Pressman-Gutman be ordered to deposit funds in the amount of $120,000 with AMICO as collateral security, based upon Customs' demands against AMICO in connection with the agency's demands for

redelivery of Pressman-Gutman's merchandise.  *Id*. at 1-5, 7.  In addition,  AMICO requests that Pressman-Gutman be ordered to reimburse a total of $13,246.80 as "reasonable attorney's fees" and expenses, as invoiced by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP ("GDLSK") and the Law Offices of Michael P. O'Connor.  *See id*. at 2, 6-7; AMICO Cross-Motion, Affirmation in Support of Attorney's Fees of Edward B. Ackerman, Esq. ("Ackerman Aff."), Exh. 1; AMICO Cross-Motion, Affirmation of Michael P. O'Connor, Esq. ("O'Connor Aff."), Exh. 1.

The dismissal of the Government's Complaint moots AMICO's motion requesting that Pressman-Gutman be ordered to deposit $120,000 as collateral security.  *See* section I.D, *supra*. Accordingly, the sole outstanding issue is AMICO's claim against Pressman-Gutman for attorneys' fees and expenses under the indemnity agreement.

Pressman-Gutman maintains that GDLSK had a conflict of interest that should have precluded the firm from representing AMICO.  *See* Pressman-Gutman Response to Cross-Motion at 2, 13-18.  Pressman-Gutman contends that all claims for attorneys' fees and expenses relating to GDLSK's representation of AMICO – whether incurred by the Law Offices of Michael P. O'Connor or by GDLSK itself – thus must be denied.  *See id*. at 2, 18-20. Pressman-Gutman also objects to payment of certain other fees invoiced by the Law Offices of Michael P. O'Connor, including fees for work related to cases other than the instant action, and a $200 filing fee.  *See id*. at 2, 20 & n.14.

As discussed in greater detail below, AMICO raises virtually no defense to Pressman-Gutman's conflict of interest claims, which have substantial merit.  Accordingly, AMICO's Cross-Motion for Collateral Security and Attorney's Fees must be granted in part, and denied in part.

A.  <u>Statement of Facts</u>

Companies that import commercial merchandise into the United States are required, with few exceptions, to post a bond to ensure that all regulatory and statutory obligations associated with the importation of that merchandise are satisfied.  *See* 19 C.F.R. § 113; *see also* AMICO Cross-Motion at 2.  Several years before the entry of the merchandise at issue in this action, at Pressman-Gutman's request, AMICO executed and delivered to Customs a continuous customs bond in the amount of $120,000, to guarantee Pressman-Gutman's obligations to the United States.  *See id.* at 2-3; Complaint, Exh. 1.  It is that bond which is at issue in this action.

In consideration of and prior to AMICO's execution of the bond, AMICO required Pressman-Gutman to execute an indemnity agreement.  *See* AMICO Cross-Motion at 3, Exh. B. Pursuant to the "collateral security clause" of that agreement, Pressman-Gutman undertook:

> To indemnify and save harmless [AMICO] from and against any and all liability, claim, demand, loss, damage, expense, cost, [and] *attorney's fees and expenses*, includ[ing] without limitation, *fees and disbursements of counsel incurred by [AMICO] in any action or proceeding between [Pressman-Gutman] and [AMICO], or between [AMICO] and any third party*, which [AMICO] shall at any time incur by reason of its execution of any bond or its payment of or its liability to pay any claim, irrespective of whether the claim is made against [AMICO] as a joint or several obligee and whether [Pressman-Gutman] is then liable to make such payment, and to place [AMICO] in funds to meet all its liability under any bond, promptly upon request and before [AMICO] may be required to make any payment thereunder[;] and [a] copy of the claim, demand, voucher or other evidence of the payment by [AMICO] of any liability, claim, demand, loss, damage, expense, cost and *attorney's fees*, shall be *prima facie* evidence of the fact and amount of [Pressman-Gutman's] liability to [AMICO] under this agreement. *Any demand upon [AMICO] by [Customs] shall be sufficient to conclude that a liability exists and [Pressman-Gutman] shall then place [AMICO] with sufficient funds in a form and amount deemed acceptable in [AMICO's] sole discretion, as collateral security to cover the liability*.

AMICO Cross-Motion at 3, Exh. B (emphases added).

As discussed in section I.A above, in early February 2000, Customs made demands for redelivery of two entries of fabric more than four months after the merchandise had been imported by Pressman-Gutman, and more than three months after Pressman-Gutman had provided samples of the goods for analysis in response to Customs' requests. *See* Pressman-Gutman Response to Cross-Motion at 3.

According to the demands for redelivery, the merchandise had been misclassified upon entry, and had entered the United States under the wrong quota category. *See* Pressman-Gutman Response to Cross-Motion at 3. In the demands for redelivery, Customs directed Pressman-Gutman to either return the merchandise to the agency's custody or submit new visas reflecting the proper quota category from the exporting country. *See id.* However, because of Customs' delays in issuing the demands for redelivery, Pressman-Gutman was unable to obtain new visas or to redeliver the merchandise. *See id.*; Recording of Oral Argument at 00:13:10. As a result, in early 2000, Customs initiated administrative proceedings seeking liquidated damages from Pressman-Gutman in connection with the bond covering the entries in question. *See* Pressman-Gutman Response to Cross-Motion at 3-4.

Pressman-Gutman retained the law firm Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP ("GDLSK") to represent it in the disputes with Customs concerning the two subject entries of merchandise, also in early 2000. *See* Pressman-Gutman Response to Cross-Motion at 4. In connection with its representation of Pressman-Gutman, GDLSK's actions included:

- ◆   In March 2000 and February 2001, GDLSK submitted petitions to Customs in connection with Pressman-Gutman's request for reconsideration of NY F82252 (a ruling letter dated February 8, 2000, issued by Customs' New York office, in response to Pressman-Gutman's request for a ruling on the

classification of its merchandise).  The request for reconsideration was denied by HQ 963787 (September 4, 2002);

◆ In March 2000, GDLSK protested the demands for redelivery on behalf of Pressman-Gutman.  In June 2001, GDLSK filed additional arguments with Customs in connection with that protest, arguing that the demands for redelivery were untimely.  The letter from Customs denying the protest was issued on April 16, 2004, and addressed to GDLSK;

◆ In October 2004, GDLSK filed a summons with this court on behalf of Pressman-Gutman, commencing an action contesting Customs' denial of the protest filed by GDLSK challenging the demands for redelivery (Pressman-Gutman Co., Inc. v. United States, Court No. 04-00511, which remains on the court's Reserve Calendar); and

◆ GDLSK handled this matter for Pressman-Gutman continuously from early 2000 until early 2005, when Pressman-Gutman transferred the matter to another law firm (Coudert Brothers).

See Pressman-Gutman Response to Cross-Motion at 4.

When Pressman-Gutman refused to pay Customs' assessment of liquidated damages, Customs made a series of formal demands – beginning in mid-November 2004, and continuing through mid-January 2005 – against the bond that AMICO had executed on Pressman-Gutman's behalf.  See AMICO Cross-Motion at 3; Pl.'s Opposition to Motions to Dismiss at 4; Complaint ¶¶ 16, 19, 28, 31, Exhs. 8, 17.  AMICO, in turn, forwarded Customs' demands to Pressman-Gutman, pressing Pressman-Gutman to post security in accordance with the terms of the collateral security clause of the indemnity agreement, to secure AMICO's potential obligations to Customs under the bond.  See AMICO Cross-Motion at 3-4; Pressman-Gutman Response to Cross-Motion at 4-5. AMICO explained that it was contractually obligated to pay the demands to Customs, and that it risked sanctions (including a prohibition on underwriting customs bonds) if it failed to meet its contractual obligations.  See Pressman-Gutman Response to Cross-Motion at 5. AMICO threatened

Pressman-Gutman that AMICO would "proceed with settlement of this claim with [Customs]" unless Pressman-Gutman provided AMICO with "proof of petition, offer in compromise, payment or cancellation of the [liquidated damages claim]" asserted by Customs. *See* AMICO Cross-Motion, Barther Affirmation ("Barther Aff."), Exh. 2.

Pressman-Gutman refused AMICO's requests that it post collateral security. *See* AMICO Cross-Motion at 4. However, Pressman-Gutman (through its second law firm, Coudert Brothers, which replaced GDLSK in early 2005) urged Customs – and, later, the Department of Justice – to rescind Customs' demands against AMICO until a determination was reached in <u>Pressman-Gutman Co., Inc. v. United States</u>, Court No. 04-00511 (the action that GDLSK filed on Pressman-Gutman's behalf, challenging the validity of Customs' demands for redelivery). *See* Pressman-Gutman Response to Cross-Motion at 5.

Although Pressman-Gutman was not successful in having Customs' demands against AMICO rescinded, the liquidated damages cases were forwarded to Customs' lawyers, who were instructed to seek waivers of the statute of limitations from Pressman-Gutman and AMICO. *See* Pressman-Gutman Response to Cross-Motion at 5-6. Pressman-Gutman offered to execute such a waiver. *See* Pressman-Gutman Response to Cross-Motion at 6. However, after reviewing Pressman-Gutman's financial statements and considering Pressman-Gutman's unwillingness to post collateral security, AMICO refused to do so. *See* Pressman-Gutman Response to Cross-Motion at 6.

In the course of discussions that Pressman-Gutman's counsel had with AMICO concerning the possibility of waiving the statute of limitations, AMICO indicated that it was considering asking

GDLSK to evaluate the strength of Pressman-Gutman's submissions to Customs and the Department of Justice. *See* Pressman-Gutman Response to Cross-Motion at 6 n.5. According to Pressman-Gutman, "[t]hat was the first of many times where [AMICO] was advised that GDLSK was conflicted from representing [AMICO] in this matter because GDLSK itself prepared the administrative petitions and filed Pressman-Gutman's lawsuit contesting the denial of the protest." *See id.*

Customs' lawyers advised that, without waivers of the statute of limitations from both AMICO and Pressman-Gutman, the agency would be forced to file suit on the liquidated damages claims. *See* Pressman-Gutman Response to Cross-Motion at 6. Pressman-Gutman nevertheless continued to seek a negotiated resolution; but its efforts met with no success. *See id.* at 6-7. Accordingly, the Government filed the instant lawsuit – exactly six years to the day after Customs made the demands for redelivery at issue in this action. *See id.* at 7.

The following week, AMICO sent a letter to Pressman-Gutman demanding that Pressman-Gutman post collateral security in the amount of $170,000, an amount calculated by AMICO to cover its potential exposure to Customs under the bond, as well as potential interest and "anticipated legal fees." *See* Pressman-Gutman Response to Cross-Motion at 7. Pressman-Gutman then retained the law firm Neville Peterson LLP to handle this matter. *See id.*

Negotiations followed concerning the possibility of establishing an escrow account as collateral security, but the parties were unable to reach an agreement. *See* Pressman-Gutman Response to Cross-Motion at 7. In the course of those negotiations, Pressman-Gutman learned that AMICO had in fact retained GDLSK to represent it against Pressman-Gutman in this matter. *See*

*id*.  Neville Peterson informed AMICO and GDLSK on several occasions that GDLSK was conflicted from representing AMICO.  *See id*.  Nevertheless, on March 3, 2006, GDLSK entered a Notice of Appearance in this action on behalf of AMICO.  *See id*. at 7-8; Notice of Appearance (March 3, 2006).

Pressman-Gutman promptly moved to disqualify GDLSK as AMICO's counsel in this matter.  *See generally* Defendant Pressman-Gutman Co.'s Motion to Disqualify; Defendant Pressman-Gutman Co., Inc.'s Memorandum of Law in Support of Its Motion to Disqualify ("Pressman-Gutman Motion to Disqualify"); *see also* Pressman-Gutman Response to Cross-Motion at 8.  In lieu of responding to that motion, GDLSK withdrew its appearance, and the Law Offices of Michael P. O'Connor were substituted as counsel for AMICO.  *See* Notice of Substitution of Attorney (April 26, 2006); *see also* Pressman-Gutman Response to Cross-Motion at 8.  Pressman-Gutman then withdrew its Motion to Disqualify as moot.  *See* Letter from Counsel for Pressman-Gutman re: Withdrawal of Motion to Disqualify (May 3, 2006); *see also* Pressman-Gutman Response to Cross-Motion at 8.

In the meantime, in a letter sent in early March 2006, Pressman-Gutman had advised AMICO that it wished to work with AMICO to post $120,000 in collateral security.  *See* Pressman-Gutman Response to Cross-Motion at 8.  But the letter cautioned that Pressman-Gutman would not "agree that the indemnity agreement obligates [Pressman-Gutman] to pay attorneys' fees and expenses generated by a law firm whose representation of [AMICO] would give rise to a conflict of interest cognizable under the New York Lawyer's Code of Professional Responsibility due to that firm's prior representation of [Pressman-Gutman] in the same matter."  *See id*.

Although AMICO replaced GDLSK as counsel in this litigation after Pressman-Gutman moved to disqualify the firm, AMICO's Cross-Motion seeks not only to have Pressman-Gutman post $120,000 as collateral security, but also to have Pressman-Gutman reimburse AMICO for attorneys' fees and expenses for services rendered by GDLSK prior to the firm's withdrawal.  *See* AMICO Cross-Motion at 6-7; AMICO Cross-Motion, Ackerman Aff., Exh. 1 (invoice for fees and expenses totaling $5,181.30).  In addition, the Cross-Motion seeks reimbursement for attorneys' fees and expenses for services rendered by the Law Offices of Michael P. O'Connor.  *See* AMICO Cross-Motion at 2, 6-7; AMICO Cross-Motion, O'Connor Aff., Exh. 1 (invoice for fees and expenses totaling $8,065.50).

### B.  Analysis

Under the language of the indemnity agreement's collateral security clause, Pressman-Gutman undertook to indemnify AMICO for "any and all . . . attorney's fees and expenses . . . which [AMICO] shall at any time incur by reason of its execution of any bond . . . or its liability to pay any claim."  AMICO Cross-Motion, Exh. B.  Courts have sustained and enforced similar agreements, and similar provisions, in other cases.  *See*, *e.g.*, AMICO v. Pennsylvania Beads Corp., 983 F. Supp. 437, 442 (S.D.N.Y. 1997) (granting attorneys' fees to surety, based on indemnity agreement including provision comparable to that in this case); *see also* AMICO Cross-Motion at 5.

Pressman-Gutman does not here challenge the validity of collateral security clause, or the indemnity agreement as a whole.  Nor does Pressman-Gutman dispute that attorneys' fees and expenses are covered by the collateral security clause of that agreement.  However, Pressman-Gutman vigorously contests $7,564.74 of the $13,246.80 that AMICO seeks as reimbursement for

attorneys' fees and expenses.  *See generally* Pressman-Gutman Response to Cross-Motion at 2, 13-20.  Specifically, Pressman-Gutman disputes the entire $5,181.30 that AMICO claims as attorneys' fees and expenses for services rendered to AMICO by GDLSK.  *See id*. at 2, 13-19; AMICO Cross-Motion, Ackerman Aff., Exh. 1.  Pressman-Gutman similarly contests AMICO's Cross-Motion as to $2,383.44 of the $7,865.50 in fees and expenses invoiced by the Law Offices of Michael P. O'Connor – in particular, fees for services involving GDLSK's continued participation in this action, fees for work relating to cases other than the instant action, and a $200 filing fee.  *See* Pressman-Gutman Response to Cross-Motion at 2, 18-20 & n.14; AMICO Cross-Motion, O'Connor Aff., Exh. 1.[19]

### 1.  Pressman-Gutman's Claims of Conflict of Interest

Pressman-Gutman's defense to AMICO's cross-claim for attorneys' fees and expenses is predicated largely on Pressman-Gutman's claim that AMICO's representation by GDLSK was tainted by a conflict of interest.  In particular, Pressman-Gutman contends that, because of GDLSK's representation of Pressman-Gutman from 2000 through 2005, GDLSK "suffered from . . . [a] conflict of interest from the first moment it represented AMICO with respect to this claim."  *See* Pressman-Gutman Response to Cross-Motion at 2, 4.

Pressman-Gutman argues that – absent Pressman-Gutman's consent, after full disclosure – GDLSK was barred from representing AMICO in this matter, because AMICO's interests were

---

[19]The $200 fee was invoiced as "Attorney Service Bureau – Expedited Filing of Answer and Counterclaim with Court of International Trade."  *See* AMICO Cross-Motion, O'Connor Aff., Exh. 1.

materially adverse to those of Pressman-Gutman.  *See* Pressman-Gutman Response to Cross-Motion at 2, 14-18; *see also* Pressman-Gutman Motion to Disqualify at 1, 7-11.  According to Pressman-Gutman, "[a]ny other result would create a meaningful possibility that secrets and other privileged information GDLSK learned during its representation of [Pressman-Gutman] in this matter might be passed on to, and exploited by, its adverse co-defendant," AMICO.  *See* Pressman-Gutman Motion to Disqualify at 10; *see also id.* at 6 (emphasizing that GDLSK "received considerable confidential information" in the course of its representation of Pressman-Gutman).[20]

In support of its assertions, Pressman-Gutman points to Disciplinary Rule ("DR") 5-108 of the New York Lawyer's Code of Professional Responsibility, entitled "Conflict of Interest – Former Client," which governs an attorney's continuing duty to a former client.  *See generally* 22 N.Y.C.R.R. § 1200.27, New York Lawyer's Code of Professional Responsibility, Disciplinary Rule 5-108 ("DR 5-108"); *see also* ABA Model Rules of Professional Conduct Rule 1.9; Pressman-Gutman Response to Cross-Motion at 14-17; Pressman-Gutman Motion to Disqualify at 1, 7-11.[21]

---

[20]*See also*, *e.g.*, <u>Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.</u>, 687 F. Supp. 3d 381, 392-93 (S.D.N.Y. 2010) (explaining that, "[o]nce it is established that a substantial relationship exists between [a lawyer's] prior and current matters, it is presumed that counsel who participated in both had access during the first litigation to confidential information that would be relevant in the second"); <u>In re American Airlines, Inc.</u>, 972 F.2d 605, 618-20 (5th Cir. 1992) (explaining that "the substantial relationship test" for conflicts of interest "is concerned with both a lawyer's duty of confidentiality *and* his duty of loyalty," such that "a lawyer who has given his advice in a substantially related matter must be disqualified, whether or not he has gained confidences"; holding that "the ethical prohibition against successive representation cannot be reduced to the protection of clients' confidences").

[21]According to Pressman-Gutman, because GDLSK has its principal office in New York and because virtually all of the partners and associates resident in that office are admitted to practice law in the state, it is appropriate to look to the New York Lawyer's Code of Professional Responsibility and Disciplinary Rules to determine the ethical obligations of counsel.  *See* Pressman-Gutman

As New York's highest court has explained, DR 5-108 is intended to "ensur[e] that attorneys remain faithful to the fiduciary duties of loyalty and confidentiality owed . . . to their clients," to "avoid the appearance of impropriety," to "protect[] client confidences from misuse in substantially related and adverse litigation," to "free[] [a] former client from any anxiety that matters disclosed to an attorney will subsequently be used against it in related litigation," and to "provide[] a clear and readily administered test" for attorney conflicts of interest.  *See* Kassis v. Teacher's Ins. & Annuity Assn., 717 N.E.2d 674, 677 (N.Y. 1999); *accord* Tekni-Plex, Inc. v. Meyner and Landis, 674 N.E.2d 663, 666-67 (N.Y. 1996) (Kaye, C.J.).[22]

---

Response to Cross-Motion at 14 n.12; Pressman-Gutman Motion to Disqualify at 7 n.4.  At oral argument, AMICO agreed that the New York Lawyer's Code of Professional Responsibility and Disciplinary Rules should govern.  *See* Recording of Oral Argument at 02:20:10.  In addition, as discussed in greater detail below, DR 5-108 has been cited and applied by New York state courts, the federal district courts in the state, and the U.S. Court of Appeals for the Second Circuit, in other similar cases.

However, a recent decision by the U.S. District Court for the Southern District of New York states that – although "courts look to the American Bar Association Model Rules of Professional Conduct and to state disciplinary rules including, in this forum, the New York Rules of Professional Conduct" – "these rules provide guidance only and are not conclusive," because the disqualification of an attorney for conflict of interest "is a function of the court's inherent supervisory power."  *See* Revise Clothing, 687 F. Supp. 2d at 388; *see also* In re American Airlines, 972 F.2d at 609-10 (in case involving conflict of interest, noting that state bar's Code of Professional Responsibility is "not the "sole" authority""; explaining that, in considering disqualification of counsel, court considers "the ethical rules announced by the national profession in light of the public interest and the litigants' rights"; emphasizing that "disqualification cases are governed by state and national ethical standards") (citations omitted).

In any event, there has been no suggestion that the analysis here turns on the application of any specific set of rules or body of law, or that the outcome of the analysis would differ under any other set of rules or the law of any other jurisdiction.

[22]*See*, *e.g.*, Apeldyn Corp. v. Samsung Elecs. Co., 693 F. Supp. 2d 399, 404 (D. Del. 2010) (explaining that "the settled case law of the Third Circuit . . . holds that '[t]he maintenance of public

DR 5-108 states, in pertinent part:

A.      . . . [A] lawyer who has represented a client in a matter shall not, *without the consent of the former client* after full disclosure:

1.      Thereafter represent another person in *the same or a substantially related matter* in which that person's *interests are materially adverse* to the interests of the former client.

DR 5-108 (emphases added).  Pressman-Gutman maintains that, by representing AMICO (the surety) in this matter without first obtaining a waiver from Pressman-Gutman (the principal), GDLSK violated DR 5-108(A), because GDLSK previously represented Pressman-Gutman in this same matter, and the interests of the principal and the surety are materially adverse.  *See* Pressman-Gutman Response to Cross-Motion at 14.  As discussed in greater detail below, AMICO offers essentially no defense to Pressman-Gutman's assertions.  Based on the existing record, an analysis of each of the three key elements of DR 5-108(A) validates Pressman-Gutman's claims.

As to the first element of DR 5-108(A), it is abundantly clear that Pressman-Gutman never gave its consent to GDLSK's representation of AMICO; nor did Pressman-Gutman in any way waive any conflict of interest arising out of that representation.  *See* Pressman-Gutman Response to Cross-Motion at 14; Pressman-Gutman Motion to Disqualify at 1, 7-8.[23]  AMICO does not

_____

confidence in the propriety of the conduct of those associated with the administration of justice is so important, a court may disqualify an attorney for failing to avoid even the appearance of impropriety.'"; further noting that "'any doubt as to the propriety of the representation should be resolved in favor of disqualification'") (citations omitted).

[23]In what may be nothing more than an excess of rhetorical flourish, Pressman-Gutman asserts at one point in its brief that GDLSK "suffered from an absolute and *unwaivable* conflict of interest."  *See* Pressman-Gutman Response to Cross-Motion at 2 (emphasis added).  However, DR 5-108 on its face contemplates the possibility of the "consent of the former client after full disclosure"; and Pressman-Gutman proffers no authority to support the proposition that any conflict

contend otherwise.   *See generally* AMICO Cross-Motion; Reply Affirmation of Michael P.

O'Connor ("O'Connor Reply Aff.").

The second element of DR 5-108(A) concerns the relationship between the attorney's prior

engagement and the subsequent one – that is, whether the subsequent engagement involves "the

same or a substantially related matter."  *See* DR 5-108(A); *see also* Solow v. W.R. Grace & Co., 632

N.E.2d 437, 438-39 (N.Y. 1994); Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc., 687 F. Supp.

2d 381, 392 (S.D.N.Y. 2010) (explaining that "if the facts giving rise to an issue which is material

in both the former and the present litigations are as a practical matter the same, then there is a

'substantial relationship' between the representations") (citation omitted).

As Pressman-Gutman explains, it is beyond cavil that GDLSK's two engagements (by

Pressman-Gutman, and then by AMICO) involved "the same or a substantially related matter"

within the meaning of DR 5-108(A).  *See generally* Pressman-Gutman Response to Cross-Motion

at 14-15.  AMICO does not dispute this point.  *See generally* AMICO Cross-Motion; O'Connor

Reply Aff.

Although GDLSK never represented Pressman-Gutman in the instant lawsuit, GDLSK

plainly represented Pressman-Gutman in this same matter.  GDLSK was retained by Pressman-

Gutman in 2000, and – on Pressman-Gutman's behalf – filed a protest challenging Customs'

demands for redelivery (which are at the heart of this lawsuit) in administrative proceedings before

the agency, from start to finish.  *See* Pressman-Gutman Response to Cross-Motion at 14; Complaint,

_____

could not have been waived.  *See* DR 5-108(A).  It is, in any event, undisputed that Pressman-
Gutman never gave its consent to GDLSK's representation of AMICO or otherwise waived any of
its rights under DR 5-108(A).

Exh. 9 (Protest, dated March 29, 2000 and signed by GDLSK attorney, with GDLSK's name and address listed on behalf of Pressman-Gutman as the "Person To Whom Any Notice of Approval or Denial Should Be Sent"); Pressman-Gutman Motion to Disqualify at 3, Exh. 2 (Customs letter addressed to GDLSK, dated April 16, 2004, denying Protest).

Then, after Customs denied Pressman-Gutman's protest in April 2004, GDLSK filed a lawsuit in this court – on Pressman-Gutman's behalf – challenging the denial of the protest and arguing, *inter alia*, that the demands for redelivery (which directly gave rise to the claims for liquidated damages at issue in the instant lawsuit) were untimely and invalid. *See* Pressman-Gutman Response to Cross-Motion at 14-15; Complaint, Exh. 9 (Summons filed in Court No. 04-00511, dated October 12, 2004, listing GDLSK's contact information as "Name, Address and Telephone Number of Plaintiff's Attorney").

In addition, again on Pressman-Gutman's behalf, GDLSK filed a request asking that Customs reconsider the agency's classification ruling letter (which had supported the allegations of misclassification in the demands for redelivery). *See* Pressman-Gutman Response to Cross-Motion at 15; HQ 963787 (Sept. 4, 2002) (Customs Headquarters ruling, addressed to GDLSK, denying Pressman-Gutman's request for reconsideration of classification ruling NY F82252).

Even from such summary descriptions, it seems patently obvious that, in each of the above-referenced capacities, GDLSK was representing Pressman-Gutman in the "same . . . matter" as that in the instant lawsuit. And, even if they did not involve the "same . . . matter," they are undeniably "substantially related." Either way, the second element of DR 5-108(A) is satisfied.

The third and final element of DR 5-108(A) concerns the nature of the interests between the attorney's two clients vis-a-vis "the same or a substantially related matter" – specifically, whether (with respect to that matter) the interests of the new client are "materially adverse" to the interests of the former client.  *See* DR 5-108(A); *see also* <u>Solow v. W.R. Grace</u>, 632 N.E.2d at 438-40. AMICO contends that, "at the time the legal work was performed [by GDLSK for AMICO], a conflict had not [yet] arisen."  *See* O'Connor Reply Aff. at ¶ 10.  But, rather incredibly, AMICO alleges no facts, advances no arguments, and cites no legal authority whatsoever to attempt to substantiate that position.  *See generally* AMICO Cross-Motion; O'Connor Reply Aff. at ¶ 10.[24]

AMICO's bald, conclusory assertion that "a conflict had not [yet] arisen" can carry no weight.  Moreover, the assertion simply is not borne out by the existing record.  The record (admittedly developed with essentially no input from AMICO) indicates that the interests of Pressman-Gutman and AMICO are – and, at all times relevant here, were – "materially adverse." *See generally* Pressman-Gutman Response to Cross-Motion at 15-16.

---

[24]In its entirety, AMICO's defense to Pressman-Gutman's claims of conflict of interest on the part of GDLSK constitutes *a mere three sentences*, and is utterly devoid of any concrete facts, argument, or citations to legal authority:

> Pressman-Gutman's allegation of the conflict of the Grunfeld Desiderio firm does not rise to a level that would prohibit the payment of the fees incurred. . . . [A]t the time the legal work was performed, a conflict had not arisen.  A conflict doesn't exist until the event (in the instant matter the inability of the parties to reach a settlement on collateral) giving rise to a conflict occurs.

O'Connor Reply Aff. at ¶ 10.  Parties are not permitted to make bald, sweeping assertions such as these and then expect the court to make their case for them.

Perhaps the most obvious proof of the "material adversity" of interests are the cross-claims against Pressman-Gutman included with AMICO's Answer in this action, and AMICO's Cross Motion for Collateral Security and Attorney's Fees (which is decided herein). Although the interests of both Pressman-Gutman and AMICO would be satisfied if Pressman-Gutman ultimately prevailed against the Government in this action, AMICO's principal interest naturally has always been in ensuring that AMICO suffers no loss *whatever the consequences of any litigation for Pressman-Gutman*. Under such circumstances, the interests of the parties are, by definition, materially adverse. *See generally* Pressman-Gutman Response to Cross-Motion at 16.[25]

AMICO argues that a "conflict doesn't exist until the event (in the instant matter the inability of [AMICO and Pressman-Gutman] to reach a settlement on collateral) giving rise to a conflict

---

[25]Pressman-Gutman also cites "[t]he prior history of this matter" to illustrate the material adversity of the interests of Pressman-Gutman and AMICO. Pressman-Gutman emphasizes, for example, that – although AMICO did not demand collateral security from Pressman-Gutman while Pressman-Gutman was still represented by GDLSK in this matter, AMICO made a demand for collateral security in January 2005, when Customs made new demands on AMICO for liquidated damages. *See* Pressman-Gutman Response to Cross-Motion at 15; *see also* AMICO Cross-Motion at 3-4. Pressman-Gutman further notes that, although AMICO did not press its claim for collateral security against Pressman-Gutman while Pressman-Gutman continued negotiations with the Department of Justice in early 2003, AMICO refused to execute a waiver of the statute of limitations after reviewing Pressman-Gutman's financial statements, when Pressman-Gutman refused to post collateral security out of fears that AMICO might pay Customs' claim (effectively foreclosing any possibility of meaningful judicial review of the timeliness of Customs' demands for redelivery) and then file a collection action seeking reimbursement under the indemnity agreement. *See* Pressman-Gutman Response to Cross-Motion at 15. In addition, Pressman-Gutman points out that the divergent interests of Pressman-Gutman and AMICO caused the breakdown of the parties' negotiations over the terms of an escrow account to be established to hold collateral security. *Id.*

occurs." *See* O'Connor Reply Aff. at ¶ 10.[26]   However, at the latest, AMICO's January 2005

demand for collateral security (which Pressman-Gutman refused) established a relationship between

the parties that was "materially adverse" within the meaning of DR 5-108(A) – well before GDLSK

began its representation of AMICO. *See, e.g.*, AMICO Cross-Motion, Barther Aff., Exh. 2 (AMICO

letter to Pressman-Gutman, dated January 19, 2005, threatening Pressman-Gutman that "[AMICO]

will proceed with settlement of this claim with [Customs]" unless Pressman-Gutman provides "proof

of petition, offer in compromise, payment or cancellation of the [liquidated damages claim]"

asserted by Customs); *see also* n.25, *supra* (discussing other examples illustrating the materially

adverse nature of the parties' interests, pre-dating GDLSK's representation of AMICO).

Based on DR 5-108(A) and GDLSK's prior representation of Pressman-Gutman, GDLSK

has at all times been conflicted from representing AMICO in this action. *Cf.* Pyle v. Meritor Savings

Bank, 1993 WL 483196 * 1-2 (E.D. Pa. 1993) (ruling that law firm that represented both bank and

bank officers as co-defendants in lawsuit was disqualified from representing all co-defendants in

same lawsuit after interests of bank diverged from interests of bank officers).  As the New York

Court of Appeals has explained:

> Attorneys owe a continuing duty to former clients not to reveal confidences learned
> in the course of their professional relationship.  It is this duty that provides the
> foundation for the well-established rule that a lawyer may not represent a client in
> a matter and thereafter represent another client with interests materially adverse to
> interests of the former client in the same or a substantially related matter. . . . Indeed,
> such "side switching" clearly implicates the policies both of maintaining loyalty to
> the first client and of protecting that client's confidences.

---

[26]AMICO fails to state precisely when it contends a conflict of interest actually arose (or
would have arisen).

Kassis, 717 N.E.2d at 676-77.  In the words of Kassis, GDLSK's representation of AMICO in this

matter at a minimum gave the appearance of compromising GDLSK's loyalty to its first client,

Pressman-Gutman, and jeopardizing Pressman-Gutman's confidences.

DR 5-108(A)'s bar on "successive representation" prohibited GDLSK from representing

AMICO here, because AMICO's interests were in direct conflict with those of Pressman-Gutman,

which GDLSK had previously represented *in this very same matter*.  *See generally*, *e.g.*, In re

American Airlines, 972 F.2d 605, 620-21, 627-28 (5th Cir. 1992) (issuing writ of mandamus

instructing district court to grant party's motion to disqualify its former counsel from representing

its competitor in antitrust litigation between the parties).[27]

---

[27]Pressman-Gutman recognizes that the rule on disqualification is not to be applied "bluntly," and that, for example, where one attorney has moved from one law firm to another, the confidential knowledge of one attorney is not automatically imputed to each and every one of his or her former colleagues.  *See generally* Pressman-Gutman Response to Cross-Motion at 17-18 (*citing* Solow v. W.R. Grace, 632 N.E.2d at 440 (noting that "a *per se* disqualification rule . . . conflicts with public policies favoring client choice and restricts an attorney's ability to practice"; reversing disqualification of law firm, where the individuals with conflict of interest had left the firm years before the current representation and because the firm in question was large and departmentalized, with nearly 400 attorneys at the time of the prior representation)).  However, Pressman-Gutman explains that – in this case, unlike Solow v. W.R. Grace – "there is ample reason to conclude that the GDLSK firm is disqualified from representing AMICO":

> First, there are numerous attorneys currently with [GDLSK] who were engaged in representing Pressman-Gutman against Customs with respect to the liquidated damages claims here at bar.  GDLSK is a relatively small firm, occupying offices in a single floor of a Manhattan office building, an environment where cross-communication regarding client matters is likely.  There is thus a greater chance that GDLSK attorneys have acquired confidential knowledge relating to Pressman-Gutman and its defense of these claims.  *See* Cardinale v. Golinello, 43 N.Y.2d 288, [292 (1977)].

Pressman-Gutman Response to Cross-Motion at 17.  AMICO does not dispute any aspect of Pressman-Gutman's characterization of GDLSK.  *See generally* AMICO Cross-Motion; O'Connor

2.  <u>Pressman-Gutman's Request for Reduction in Attorneys' Fees and Expenses</u>

Pressman-Gutman argues that it would "compound[] [the] injustice" of GDLSK's violation of its ethical obligations vis-a-vis Pressman-Gutman to require Pressman-Gutman to enforce the collateral security clause of the indemnity agreement by forcing Pressman-Gutman to compensate GDLSK for its conflicted representation of AMICO in this matter.  *See* Pressman-Gutman Response to Cross-Motion at 19 (*quoting* <u>Image Tech. Service, Inc. v. Eastman Kodak Co.</u>, 136 F.3d 1354, 1359 (9th Cir. 1998)).  Pressman-Gutman similarly contends that – because AMICO knew of the conflict of interest when it retained GDLSK to represent it in this matter – Pressman-Gutman should not be required to reimburse AMICO for the attorneys' fees and expenses charged by GDLSK.  *See id*. at 2, 18-19.[28]

Except to accuse Pressman-Gutman of "selectively deciding which requirements of the indemnity agreement it will comply with," AMICO makes no attempt to refute any aspect of

---

Reply Aff. at ¶ 10.  Given these facts, Pressman-Gutman concludes that "both the actual conflict, plus the appearance of impropriety which would result if the GDLSK law firm [had] continued to advice AMICO or its other counsel in this matter, where AMICO is actually in a directly adversary position to Pressman-Gutman, mandate [GDLSK's] disqualification from providing advice to AMICO or its counsel in connection with this action."  *See* Pressman-Gutman Response to Cross-Motion at 17-18.

[28]Pressman-Gutman emphasizes that "[t]his is not a situation where a law firm is engaged by a willing client, and begins representation, only to learn at a later time of a situation compelling its withdrawal."  *See* Pressman-Gutman Response to Cross-Motion at 18.  Pressman-Gutman notes that, "[i]n such a case, the conflicted firm may be entitled to compensation for services rendered on a *quantum meruit* basis."  *Id*.  Here, however, "both the law firm and the surety knew of the conflict *ab initio*."  *Id*. & n.13 (noting that "AMICO had been provided with copies of protests and petitions filed by GDLSK, and knew that [GDLSK] had represented Pressman-Gutman with respect to this claim.").

Pressman-Gutman's argument.  *See*  O'Connor Reply Aff. at ¶¶  10-11; *see generally* AMICO

Cross-Motion.

        In other cases in a wide variety of contexts where lawyers or law firms have committed

ethical violations, federal and state courts have refused to enforce the terms of fee agreements, and

have reduced awards of attorneys' fees and expenses or denied them altogether.  In <u>Louima v. City</u>

<u>of New York</u> for example, the U.S. Court of Appeals for the Second Circuit upheld the district

court's ruling reducing attorneys' fees by 30% due to counsel's disclosure of client secrets to the

press, in violation of disciplinary rules.  *See* <u>Louima v. City of New York</u>, 2004 WL 2359943 * 2-3,

75-76, 88, 90 (E.D.N.Y. 2004), *aff'd*, 163 Fed. Appx. 70 (2d Cir. 2006) (and cases cited there)[29]; *see*

*also*, *e.g.*, <u>In re Mailman Steam Carpet Cleaning Corp.</u>, 212 F.3d 632, 637 (1st Cir. 2000) (sustaining

bankruptcy court's refusal to enforce fee agreement that violated rules of ethics, noting that "[t]he

court . . . had the right – and, arguably, the duty – to refuse to enforce it"; stating that "[h]aving

found that the . . . fee agreement violated ethical precepts, the bankruptcy court likely could have

denied . . . compensation altogether") (citations omitted); <u>Rome v. Braunstein</u>, 19 F.3d 54, 58, 62-63

(1st Cir. 1994) (affirming district court's decision sustaining bankruptcy court's ruling retroactively

---

        [29]*See also*, *e.g.*, <u>Condren v. Grace</u>, 783 F. Supp. 178, 185 (S.D.N.Y. 1992) (and cases cited
there) (noting that, "[w]ithout question, case law addressing the topic of breach of an attorney's
fiduciary duties to his client sanctions denial of legal compensation"); <u>Silbiger v. Prudence Bonds</u>
<u>Corp.</u>, 180 F.2d 917, 920-21 (2d Cir. 1950) (Hand, C.J.) (stating that "an attorney must not represent
opposed interests; and the usual consequence has been that he is debarred from receiving any fee
. . . , no matter how successful his labors.  Nor will the court hear him urge, or let him prove, that
in fact the conflict of his loyalties has had no influence upon his conduct; the prohibition is absolute
and the consequence is a forfeiture of all pay.") (footnotes omitted); <u>In re Estate of Winston</u>, 625
N.Y.S.2d 927 (2d Dep't 1995) (holding that "'[a]n attorney who engages in misconduct by violating
the Disciplinary Rules is not entitled to legal fees for any services rendered'") (*quoting* <u>Shelton v.</u>
<u>Shelton</u>, 542 N.Y.S.2d 719, 720 (2d Dep't 1989)).

disqualifying counsel for debtor and ordering forfeiture of all compensation for services, due to conflicts of interest); <u>Culebras Enterprises Corp. v. Rivera-Rios</u>, 846 F.2d 94, 97 (1st Cir. 1988) (noting that "[d]enial of attorneys' fees may be a proper sanction for violation of an ethical canon") (*citing* <u>Rybicki v. State Board of Elections</u>, 584 F. Supp. 849, 860-61 (N.D. Ill. 1984)).

In <u>Marshall v. State of New York Division of State Police</u>, the court was confronted with issue of whether a conflicted firm "should recover fees for work that it never should have undertaken." *See* <u>Marshall v. State of New York Div. of State Police</u>, 31 F. Supp. 2d 100, 109 (N.D.N.Y. 1998).  The court reduced the award of attorneys' fees by 50%, noting that "an attorney should be permitted to claim fees 'only for services provided before the conflict arose and the ethical breach occurred.'" *See id.*, 31 F. Supp. 2d at 109-10 (citation omitted).

In <u>Image Technical Service</u> – a conflict of interest case, like the case at bar – the law firm of Coudert Brothers was found to have violated its duty of loyalty to Kodak by representing the plaintiff in its antitrust case against Kodak.  *See* <u>Image Tech. Serv., Inc. v. Eastman Kodak Co.</u>, 136 F.3d 1354 (9th Cir. 1998).  Coudert Brothers had previously represented one of Kodak's affiliates over an extended period, before representing the plaintiff in the antitrust case.  *See id.*, 136 F.3d at 1355.  When Kodak learned of the conflict of interest, it successfully moved to have Coudert Brothers disqualified from the case.  *See id.*, 136 F.3d at 1355-56.  Later, the plaintiff – which prevailed in the antitrust case – sought to enforce an agreement between it and Kodak in which Kodak had agreed to pay the plaintiff $400,000 in connection with attorneys' fees invoiced by Coudert Brothers to the plaintiff.  *See id.*, 136 F.3d at 1356.  The U.S. Court of Appeals for the Ninth Circuit refused to enforce the agreement.  *See generally id.*, 136 F.3d at 1357-59.

Ruling that Kodak – "the victim of an ethical violation by plaintiff's counsel Coudert" – was

not required to pay the plaintiff the $400,000 fee for Coudert Brothers' conflicted services, the Ninth

Circuit reasoned:

> If Coudert had breached a duty of loyalty to Image Tech only, there would be a better
> argument for allowing Image Tech to recover and retain the fees.  The $400,000
> would not be so much a windfall as recompense for conflicted representation.  Here,
> however, it compounds injustice to allow Image Tech to receive $400,000 from
> Kodak, the party injured by the ethical violation.  Moreover, it is less of a concern
> that Kodak, as the defendant potentially liable for the fees, will receive a windfall if
> it is not ordered to pay Image Tech the fees, because Kodak is the client injured by
> Coudert's breach of its duty of loyalty when it simultaneously represented Kodak
> and Image Tech.

Image Tech. Serv., 136 F.3d at 1358-59; see also id., 136 F.3d at 1358 (explaining that

"[s]imultaneous representation of clients with conflicting interests (and without written informed

consent) is an automatic ethics violation in California," and that "[a]n attorney cannot recover fees

for such conflicting representation") (citations omitted); U.S. ex rel. Virani v. Jerry M. Lewis Truck

Parts & Equip., Inc., 89 F.3d 574, 579-80 (9th Cir. 1996) (noting that "California courts have often

held that when the ethical violation in question is a conflict of interest between the attorney and the

client (or between the attorney and a former client), the appropriate fee for the attorney is zero," at

least where "the violation is one that pervades the whole relationship") (citing cases involving

conflicts of interest).

Image Technical Service may not be precisely "on all fours" with the instant case as

Pressman-Gutman claims it is.  See Pressman-Gutman Response to Cross-Motion at 19 (discussing

Image Tech. Serv., 136 F.3d 1354).  But it is pretty close, and it is entirely consistent with other case

law on point.  Given the circumstances here, and in the absence of any real proffer of facts or law

by AMICO to counter Pressman-Gutman's arguments, it would be inappropriate to enforce the attorneys' fees provision of the indemnity agreement's collateral security clause against Pressman-Gutman with respect to services rendered by GDLSK.  Pressman-Gutman thus is not required to reimburse AMICO for attorneys' fees and expenses invoiced by GDLSK.

Just as Pressman-Gutman "should not be forced to finance GDLSK's breach of its duty of loyalty to Pressman-Gutman," so too Pressman-Gutman asserts that it "should not be forced to finance GDLSK's continued conflicted involvement in this matter through conferences and correspondence between GDLSK attorneys and the Law Offices of Michael P. O'Connor" that are reflected in the invoices of the latter.  *See* Pressman-Gutman Response to Cross-Motion at 19-20; *see also id*. at 2, 18-20.  AMICO again makes no substantive effort to counter Pressman-Gutman's argument.  *See generally* AMICO Cross-Motion; O'Connor Reply Aff. at ¶¶ 10-11.  Given the circumstances here, and in the absence of any response from AMICO, it would be inappropriate to enforce the attorneys' fees provision of the indemnity agreement's collateral security clause against Pressman-Gutman with respect to services rendered by the Law Offices of Michael P. O'Connor involving consultation, conferences, or correspondence with GDLSK.  Pressman-Gutman therefore is not required to reimburse AMICO for attorneys' fees and expenses for services rendered by the Law Offices of Michael P. O'Connor to the extent that those services relate to consultation, conferences, or correspondence with GDLSK concerning this matter.

Pressman-Gutman further argues that it should not be required to reimburse AMICO for attorneys' fees and expenses charged by the Law Firm of Michael P. O'Connor for "work . . . relat[ing] to cases other than the instant [liquidated damages] case," including work "relating to

separate . . . lawsuits in which Pressman-Gutman is the plaintiff, challenging the denial of its protests against the exclusion of goods." *See* Pressman-Gutman Response to Cross-Motion at 20 n.14; *see also id*. at 2. Pressman-Gutman explains that, "[b]y law, there can be no intervention in such cases, . . . and therefore there is no basis for the surety to concern itself with them." *See id*. at 20 n.14. Once more, however, AMICO alleges no facts, advances no arguments, and cites no legal authority whatsoever to respond to Pressman-Gutman's assertions. *See generally* AMICO Cross-Motion; O'Connor Reply Aff. at ¶¶ 10-11. In light of these circumstances, it would be inappropriate to enforce the attorneys' fees provision of the indemnity agreement's collateral security clause against Pressman-Gutman with respect to attorneys' fees and expenses incurred in connection with actions other than this one. Pressman-Gutman thus is not required to reimburse AMICO for attorneys' fees and expenses for services rendered by the Law Offices of Michael P. O'Connor to the extent that those services relate to cases other than the case at bar.

Pressman-Gutman's final objection is to "the $200.00 in costs invoiced by the Law Offices of Michael P. O'Connor which were allegedly incurred on April 26, 2006 and are described on the invoice as 'Attorney Service Bureau Expedited Filing of Answer and Counterclaim with Court of International Trade.'" *See* Pressman-Gutman Response to Cross-Motion at 20. As Pressman-Gutman notes, the court has an electronic filing system, obviating the need to incur any fee for such "expedited filing." *See id*. Pressman-Gutman contends that the expense is therefore "unreasonable." *See id*. AMICO is, once again, silent on the matter. *See generally* AMICO Cross-Motion; O'Connor Reply Aff. at ¶¶ 10-11. Under the circumstances, and in the absence of any explanation of the expedited filing fee by AMICO, it would be inappropriate to enforce the attorneys' fees

provision of the indemnity agreement's collateral security clause against Pressman-Gutman with respect to that fee.  Pressman-Gutman therefore is not required to reimburse AMICO for the $200 expedited filing fee invoiced by the Law Offices of Michael P. O'Connor.

In sum, AMICO's Cross Motion for Attorney's Fees in the amount of $13,246.80 is granted in part and denied in part.  Pressman-Gutman is not required to reimburse AMICO for attorneys' fees and expenses invoiced by GDLSK in the amount of $5,181.30.  Nor is Pressman-Gutman required to reimburse AMICO for the $2,383.44 in attorneys' fees and expenses invoiced by the Law Offices of Michael P. O'Connor that are set forth above – *i.e.*, fees and expenses for services relating to consultation, conferences, or correspondence with GDLSK concerning this matter; fees and expenses incurred in connection with actions other than the case at bar; and the $200 fee incurred for expedited filing of AMICO Answer and Counterclaim [Cross-Claim].  As to the remaining $5,682.06 in attorneys' fees and expenses invoiced by the Law Offices of Michael P. O'Connor, AMICO's Cross-Motion is granted.  Pressman-Gutman shall reimburse AMICO in that amount.

### III.  <u>Conclusion</u>

For all the reasons set forth above, Pressman-Gutman's Motion to Dismiss and AMICO's Cross-Motion to Dismiss must be granted, and the Government's Complaint must be dismissed. AMICO's Cross Motion for Collateral Security and Attorney's Fees is denied as to collateral security (on grounds of mootness), and is granted in part and denied in part as to attorneys' fees and expenses.  Pressman-Gutman shall reimburse AMICO for $5,682.06 in attorneys' fees and expenses.

Judgment will enter accordingly.

/s/ Delissa A. Ridgway
_____
Delissa A. Ridgway
Judge

Decided:  September 16, 2010
              New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| UNITED STATES, | : | |
| *Plaintiff*, | : | |
| v. | : | |
| | | Court No. 06-00043 |
| PRESSMAN-GUTMAN CO., INC. and AMERICAN MOTORISTS INSURANCE COMPANY, | : | |
| | : | |
| *Defendants*. | : | |

## <u>JUDGMENT</u>

This action having been duly submitted for decision; and the Court, after due deliberation, having rendered a decision herein;

Now, therefore, in conformity with said decision, it is hereby

ORDERED that Pressman-Gutman's Motion to Dismiss and AMICO's Cross Motion to Dismiss are granted; and it is further

ORDERED that AMICO's Cross Motion for Collateral Security and Attorney's Fees is denied as moot as to collateral security, and granted in part and denied in part as to attorneys' fees and expenses; and it is further

ORDERED, ADJUDGED, and DECREED that the Complaint in this matter is dismissed; and it is further

ORDERED, ADJUDGED, and DECREED that Pressman-Gutman reimburse AMICO for attorneys' fees and expenses in the sum of $5,682.06.

/s/ Delissa A. Ridgway
_____
Delissa A. Ridgway, Judge

Dated:  September 16, 2010
         New York, New York